[S. F. No. 10161. In Bank.—April 10, 1922.]

VETERANS' WELFARE BOARD (a Corporation), et al., Petitioners, v. RAY L. RILEY, as Controller, etc., Respondent.

[1] PUBLIC MONEY — BENEFIT TO SOLDIERS — PUBLIC PURPOSE. — Legislation having for its purpose the giving of a benefit to soldiers who have served their country in time of war is uniformly recognized as the application of public money for a public purpose.

---

1. Constitutionality of statutes providing for bounty or pension for soldiers, notes, Ann. Cas. 1913B, 953; 7 A. L. R. 1636; 13 A. L. R. 587; 15 A. L. R. 1359.

[2] ID.—VETERANS—FARM AND HOME AND WELFARE ACTS—EXPEN-
DITURES.—Expenditures proposed under the Veterans' Farm and
Home Purchase Act and under the Veterans' Educational Act
(Stats. 1921, pp. 815, 969) are of a public nature by reason of
the fact that they are for the benefit of veterans of the World
War.

[3] ID.—VALIDITY OF ACTS—SECTIONS 31, 32, ARTICLE IV, CONSTI-
TUTION.—Such acts do not violate sections 31 and 32, article IV,
of the constitution, prohibiting a gift or loan of the credit of
the state or the granting of extra compensation or allowance to a
public servant after service rendered.

[4] ID.—SECTION 1, ARTICLE XVI, CONSTITUTION.—Said acts do not
violate section 1, article XVI, of the constitution.

APPLICATION for Writ of Mandate to compel the
issuance of warrants for the payment of certain obliga-
tions incurred by the Veterans' Welfare Board. Writ
granted.

The facts are stated in the opinion of the court.

Milton Sapiro, George J. Hatfield, M. B. Silberberg,
Walter K. Tuller and O'Melveny, Millikin & Tuller for
Petitioners.

H. C. Lucas and Dion R. Holm for Respondent.

WILBUR, J.—The Veterans' Welfare Board, ap-
pointed under and by virtue of section 3 of an act en-
titled "An act creating a Veterans' Welfare Board and
defining its powers and duties and making an appropria-
tion in aid of its operations," approved May 30, 1921
(Stats. 1921, p. 969), petitions for writ of mandate to
compel the respondent, the state controller, to issue war-
rants for the payment of certain obligations incurred in
the performance of its duties under the above-entitled act
and also to issue warrants for obligations incurred by the
board in carrying out the provisions of "An act to pro-
vide educational opportunities for persons who served in
the army, navy or marine corps of the United States in
time of war, and making an appropriation therefor," ap-
proved May 30, 1921 (Stats. 1921, p. 967), and also to
issue warrants for the payment of expenses incurred in
carrying out the provisions of an act entitled, "An act

providing for farm and home aid for veterans, defining the powers and duties of the Veterans' Welfare Board in respect thereto and making an appropriation therefor,'' approved May 30, 1921 (Stats. 1921, p. 815).

The respondent has refused to issue the warrants upon the ground that each of these statutes is unconstitutional and void. The claims involved in this proceeding have each been audited and approved by the Veterans' Welfare Board and by the state board of control. The respondent has demurred to the petition herein and claims that these acts, and each of them, is in violation of article IV, sections 31, 32; article XVI, section 1; article I, section 21, and article IV, section 25, subdivision 19, and cites in support of that contention *People* v. *Johnson*, 6 Cal. 499; *Nougues* v. *Douglas*, 7 Cal. 65; *Stevenson* v. *Colgan*, 91 Cal. 649 [25 Am. St. Rep. 230, 14 L. R. A. 459, 27 Pac. 1089]; *Bourn* v. *Hart*, 93 Cal. 321 [27 Am. St. Rep. 203, 15 L. R. A. 431, 28 Pac. 951]; *Conlin* v. *Board of Supervisors*, 99 Cal. 17 [37 Am. St. Rep. 17, 21 L. R. A. 474, 33 Pac. 753]; *McClure* v. *Nye*, 22 Cal. App. 248 [133 Pac. 1145]; *Molineux* v. *State of California*, 109 Cal. 378 [50 Am. St. Rep. 49, 42 Pac. 34]; *Taylor* v. *Mott*, 123 Cal. 497 [56 Pac. 256]; *Powell* v. *Phelan*, 138 Cal. 271 [71 Pac. 335]. He also cites a recent decision of the court of appeals of the state of New York, *People* v. *Westchester County Nat. Bank*, 231 N. Y. 465 [15 A. L. R. 1344, 132 N. E. 241, 246], wherein an act authorizing the payment of a bonus to veterans was held violative of article VII, section 1, and article VIII, section 9, of the New York constitution, prohibiting the giving or loaning of the credit or money of the state.

The court has concluded that further argument is desirable with regard to the demand for obligations incurred under the ''Act to provide educational opportunities for persons who served in the army, navy or marine corps of the United States in time of war'' (Stats. 1921, p. 967). That branch of the case is entirely separable from the demand under the other two acts. As to that branch the matter will be continued for additional argument under the order hereinbefore made to that effect. The demands under the other acts involve different questions which have

been fully argued and upon which we have reached a conclusion which may be announced at once.

The fundamental question involved in this legislation or any legislation by which individuals profit by the moneys raised by public taxation is the question as to whether or not such moneys are expended for a public purpose. This question is discussed by the petitioners and the point is apparently conceded by the respondent. **[1]** However, in view of the importance of the question and the bearing it has upon the points raised and discussed, it should be stated that legislation having for its purpose the giving of a benefit to soldiers who have served their country in time of war is uniformly recognized as the application of public money for a public purpose. It is so thoroughly established that a public purpose is accomplished by such legislation, even though the appropriation or benefit is conferred by legislation enacted after the service is completed that it is only necessary to cite a few of the more recent cases on the subject wherein will be found a discussion and collation of the earlier cases supporting that view. (*Opinion of Justices*, 211 Mass. 608 [98 N. E. 338]; *People* v. *Westchester Nat. Bank*, 231 N. Y. 465 [15 A. L. R. 1344, 132 N. E. 241]; *State ex rel. Atwood* v. *Johnson*, 170 Wis. 218 [7 A. L. R. 1617, 175 N. W. 589]; *State ex rel. Atwood* v. *Johnson*, 170 Wis. 251 [176 N. W. 224]; *State ex rel. Hart* v. *Clausen*, 113 Wash. 570 [13 A. L. R. 580, 194 Pac. 793].)

The loaning of money to private persons has been held violative of the express or implied constitutional requirement against taxation for private purposes. This was held to be true even where the city of Boston had been nearly destroyed by fire and it was proposed to aid private persons to rebuild (*Lowell* v. *Boston*, 111 Mass. 454 [15 Am. Rep. 39]), and similar legislation for the purpose of rebuilding Charleston was also declared unconstitutional (*Feldman & Co.* v. *City Council of Charleston*, 23 S. C. 57 [55 Am. Rep. 6]). Although it was held by the supreme court of Massachusetts (*Lowell* v. *Boston, supra*) *that the* making of a loan for such a purpose is not a public purpose, a grant of money to ex-soldiers in the nature of compensation or bonus was nevertheless subsequently held to constitute a public purpose (*Opinion of Justices*, 211 Mass,

608 [98 N. E. 338]). It is manifest if an outright gift of public moneys in aid of ex-soldiers is a public purpose, that a loan to them would also be an expenditure of money for a public purpose.

The rule is stated in the recent case of *People* v. *Westchester County Nat. Bank, supra,* where the court of appeals in New York held that the statutes of that state providing for the sale of bonds and a payment of a bonus to soldiers who served in the World War was violative of certain provisions in the New York constitution, but also held that the payment of such bonus was a public purpose. In that connection the court made the following statement:

"It is said that this act serves no such purpose. We think, however, that it does. In deciding whether the object for which taxation is imposed is for a public object the courts 'must be governed mainly by the course and usage of the government, the objects for which taxes have been customarily and by long course of legislation levied, what objects or purposes have been considered necessary to the support and for the proper use of the government, whether state or municipal. Whatever lawfully pertains to this and is sanctioned by time and the acquiescence of the people may well be held to belong to a public use, and proper for the maintenance of good government, though this may not be the only criterion of rightful taxation.' (*Loan Assn.* v. *Topeka,* 20 Wall. 655, 665 [22 L. Ed. 455, see, also, Rose's U. S. Notes].) In this state the granting of pensions and gratuities for military service is not a new experiment. By the act of May 11th, 1784, public land was granted to revolutionary veterans. By chapter 8 of the Laws of 1814, pay in addition to that granted by the United States was given to soldiers of the war of 1812. By chapter 178 of the laws of 1904 a pension was granted to the last survivor of that war. By section 220 of the Military Law a pension was given to any member of the militia who had been disabled within ten years in the performance of duty. A pension policy has long been adopted by the United States and acts similar to ours have been passed in at least nineteen other states.

"The payment of a pension or a bonus for past services showing the gratitude of the people, showing that the state

is mindful of those who have made sacrifices for it, is an incitement to patriotism and an encouragement to defend the country in future conflicts. Even if such a payment is not clearly one made in the general interest, at least there is such ground for the claim that where the legislature has accepted that view, the courts may not interfere. That they believe the action unwise or unnecessary is immaterial. As to that question the legislature, in the absence of constitutional restrictions, is the final arbiter (*Jones* v. *City of Portland,* 245 U. S. 217 [62 L. Ed. 252, 38 Sup. Ct. Rep. 112]; *State ex rel. Atwood* v. *Johnson,* 170 Wis. 218 [7 A. L. R. 1617, 175 N. W. 589]; *State ex rel. Atwood* v. *Johnson,* 170 Wis. 251 [176 N. W. 224]; *Gustafson* v. *Rhinow,* 144 Minn. 415 [175 N. W. 903]; *State ex rel. Hart* v. *Clausen,* 113 Wash. 570 [13 A. L. R. 580, 194 Pac. 793]; *Opinions of Justices,* 211 Mass. 608 [98 N. E. 338]). What long custom and usage has sanctioned, what the weight of judicial authority has approved, that we should be slow to declare wrongful. Nor may a distinction be made between such a bonus as our act provides and a pension. The one is a reward for past military services payable at once; the other such a reward payable in installments. . . ."

[2] It is claimed that the purpose of these two acts (Stats. 1921, pp. 815, 969) is a public one because in furtherance of the settlement of lands and of the agricultural development of the state. There are decisions which support this view (*Hill* v. *Rae,* 52 Mont. 378 [Ann. Cas. 1917E, 210, L. R. A. 1917A, 495, 158 Pac. 826]; *Wheelon* v. *South Dakota Land Settlement Board,* 43 S. D. 551 [14 A. L. R. 1145, 181 N. W. 359]; *State* v. *Clausen,* 110 Wash. 525 [14 A. L. R. 1133, 188 Pac. 538]; *Green* v. *Frazier,* 253 U. S. 233 [64 L. Ed. 878, 40 Sup. Ct. Rep. 499]; *Smith* v. *Kansas City Title Co.,* 255 U. S. 180 [65 L. Ed. 577, 41 Sup. Ct. Rep. 243]; *McMahan* v. *Alcott,* 65 Or. 537 [133 Pac. 836]; *State ex rel. Goodwin* v. *Nelson County,* 1 N. D. 88 [26 Am. St. Rep. 609, 8 L. R. A. 283, 45 N. W. 33]) and other earlier decisions taking a more strict view which would lead to the opposite conclusion (*Allen* v. *Inhabitants of Jay,* 60 Me. 124 [11 Am. Rep. 185]; *Kingman* v. *City of Brockton,* 153 Mass. 255 [11 L. R. A. 123, 26 N. E. 998]; *Lowell* v. *City of Boston, supra; Curtis' Admr.* v. *Whipple and Others,* 24 Wis. 350 [1 Am. Rep. 187]; *Deal* v. *Mississippi*

*Co.,* 107 Mo. 464 [14 L. R. A. 622, 18 S. W. 24]; *State* v. *Township of Osawkee,* 14 Kan. 322 [19 Am. Rep. 99]; *Loan Assn.* v. *Topeka,* 20 Wall. 655 [22 L. Ed. 455, see, also, Rose's U. S. Notes]), but we base our conclusion as to the public character of the expenditure proposed entirely upon the fact that such expenditures are for the benefit of veterans of the World War and are, for that reason, of a public nature.

[3] The next question presented is the claim that the acts provide for a gift or loan in violation of sections 31 and 32 of article IV of the constitution. These sections, so far as material, are as follows:

"Credit of State or Municipalities not to be Loaned.

"Sec. 31. The legislature shall have no power to give or to lend, or to authorize the giving or lending, of the credit of the state, or of any county, city and county, city, township, or other political corporation or subdivision of the state now existing, or that may be hereafter established, in aid of or to any person, association, or corporation, whether municipal or otherwise, or to pledge the credit thereof, in any manner whatever, for the payment of the liabilities of any individual, association, municipal or other corporation whatever; nor shall it have power to make any gift, or authorize the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever; . . .

"Extra Compensation to Officers Forbidden.

"Sec. 32. The legislature shall have no power to grant, or authorize any county or municipal authority to grant, any extra compensation or allowance to any public officer, agent, servant, or contractor, after service has been rendered, or a contract, has been entered into and performed, in whole or in part, nor to pay, or to authorize the payment of, any claim hereafter created against the state, or any county or municipality of the state, under any agreement or contract made without express authority of law; and all such unauthorized agreements or contracts shall be null and void."

It is clear from these provisions, and from the above-cited decisions of this court, that if the statutes in question provide for a gift, or for a loan of the credit of the

state, they are to that extent a violation of these provisions of our state constitution, notwithstanding the purpose of the legislation is public and most laudable.

Before further considering the question thus presented, we will state in general terms the scope and effect of the laws involved in this controversy. The act establishing the Veterans' Welfare Board (Stats. 1921, p. 969), known as the California Veterans' Welfare Act, authorizes the welfare board to purchase and acquire land and water rights, to improve and subdivide such lands and sell the same at an amount which would return the purchase price and expenses incurred in connection therewith, plus five per cent interest thereon. Sales are to be made to "Any veteran who is not the holder of agricultural land or possessory rights thereto of the value of fifteen thousand dollars and who, by this purchase would not become the holder of agricultural land or possessory rights thereto exceeding such value, and who is prepared to enter within six months upon actual occupation of the land acquired . . . ". The land is to be paid for in forty years, together with interest thereon at the rate of five per cent per annum, compounded at periods fixed by the board. The amount due for improvements on the land shall be paid on amortized payments extending over a period not exceeding twenty years. The act also provides for the making of loans "not to exceed three thousand dollars to any one settler for the purchase of necessary livestock and equipment such loans to be secured in any manner that the board may direct or without security other than the personal obligation of the settler."

The general scheme of this statute, then, is to provide for the purchasing and improving of lands and the selling of the same in small parcels to veterans who will become actual settlers, the purchase price to represent the *pro rata* proportion of the actual cost of such land and improvements, the purchase price to bear interest at five per cent per annum and to be compounded if not paid.

The statute providing for farm and home aid to veterans (Stats. 1921, p. 815), known as the "Veterans' Farm and Home Purchase Act," authorizes the Veterans' Board to purchase for resale to veterans of land for agricultural purposes not exceeding to each the value of $7,500, or a

home or home site not exceeding the value of $5,000. The purchase is to be made when the board is "satisfied of the desirability of the real estate and of the ability of the applicant, and that such applicant is a veteran and that such applicant has agreed with the board to actually reside upon such real estate within six months from the date of the purchase by the board." The board is to enter into a contract with the owner for the purchase from the owner upon such terms as may be by them agreed. "The board shall enter into a contract with the applicant for the sale of said land to said applicant at a price to be fixed by the board, which will make the purchase price and sale price reciprocal, taking into account the difference, if any, in the interest rate to be paid on deferred installments by the board and the applicant, respectively, which price shall include the cost of such real estate and all expenses and costs incurred and estimated to be incurred by the board in relation thereto, inclusive of interest, administration, appraisals, examination of title, incidental expenses and such sum as shall be deemed necessary to meet unforeseen contingencies." The applicant is required to make an initial payment of ten per cent in case of a farm and five per cent in case of a home or home site, the balance to be amortized over a period not exceeding forty years with five per cent interest per annum.

In considering the attack made upon these laws it should be observed that we are only dealing with the question of whether or not there is sufficient validity in these laws to justify the appointment of the Veterans' Welfare Board and the incurring by them of expenses covered by the claims set out in the petition looking toward the carrying out of the laws. Even though some portions of these statutes, or some features of the law, may be unconstitutional, it is only necessary for the purpose of this case for us to determine whether or not there is sufficient validity in the laws to justify the arrangement made for carrying them out. Each law carries with it an appropriation. The law known as the California Veterans' Welfare Act (Stats. 1921, p. 969) makes an appropriation of $1,000,000. The Veterans' Farm and Home Purchase Act (Stats. 1921, p. 819) makes an appropriation of $2,000,000.

It is evident that a scheme of the California Veterans' Welfare Act, by which the state purchases large tracts of land, improves and subdivides it and resells it at its total cost to the state with interest at five per cent, is not a gift of either land or its value to the purchaser from the state. The advantage, if any, derived by the purchaser from the state would be altogether due to the wisdom and judgment of the Welfare Board in making its purchases and its ability to secure large areas of land at comparatively low prices and consequently to sell at a low price and also to the unusually long time which may be allowed by the board in which the purchaser may make the deferred payments. The plan of operation provided by the act is the very familiar one by which large tracts of land are provided with water for irrigation, improved, subdivided, and sold in small tracts to individual buyers on convenient terms of payment of deferred payments, with a small initial payment. So far as the purchase and sale of the land is concerned, it is not a gift. If it is not a gift, is it a loan of the credit of the state within the meaning of article IV, sections 31 and 32? The answer is that, so far as the appropriation made is concerned, the state is not lending its credit, but if the arrangement for the purchase and sale of land at all partakes of the nature of a loan it is a loan of money and not of credit. Section 31, article IV, does not prohibit the lending of the money of the state, but only of the loaning of the credit thereof. The distinction between the loaning of the money of the state and the loaning of its credit is clearly pointed out by the court of appeals of New York in *People* v. *Westchester County Nat. Bank, supra.* In that case the court made the following statements:

"This report, which was adopted with immaterial verbal alterations, became a part of article VII of the constitution. No longer under any circumstances might the credit of the state in any manner be given or loaned to or in aid of any individual, association or corporation. . . .

"This article as reported was confined solely to limiting the power of the legislature as to debts. It did not touch the power to appropriate the property of the state or the money it might raise by taxation for payments or gifts to individuals or corporations so long as such payments or

gifts subserved the public good. It was proposed to limit this power also. Mr. Charles O'Connor suggested the addition to the section of the provision 'Nor shall any gift of public moneys or property be made, except as a reward for military services, or by the release of escheats and forfeitures.' This was objected to, however, and as the evil apparently was not serious, the effort was abandoned and the section was allowed to stand as reported (Debates of the Convention, p. 722). In the address by the members of the convention to the people. it was said: 'They have incorporated many useful provisions more effectually to secure the people in their rights of person and property against the abuses of delegated power.' (Convention Journal, p. 1547.)

"Cut off from the right to loan or give the credit of the state, however, by 1867 the legislature had begun to resort freely to grants of public funds to railroads and to charitable associations. Therefore, in the constitutional convention of that year the attempt was renewed to deprive it of that power. Sanford E. Church, later the distinguished chief judge of this court, reported from the committee of finance a proposed article of the constitution. It contained a section numbered eleven. 'Neither the credit, money or property of the state shall in any manner be given or loaned to or in aid of any individual, association or corporation.' (Proceedings of Debates, p. 791.) This proposal was debated at length but it was not adopted.

"This constitution having been rejected by the people a commission was appointed in 1872 to consider amendments. It was again proposed to limit the right of the state with regard to gifts and *loans* of its property. The committee on sectarian appropriations reported a clause: 'Neither the credit nor the money or property of the state or of any county, city, village or town shall in any manner be given or loaned to or in aid of any association, corporation or other private institution whatever.' Later a substitute for this proposal was accepted—'Neither the credit nor the money of the state shall be given or loaned to or in aid of any association, corporation or other private undertaking.' Still later the word 'other' was deleted. In the report it was said that this proposed amendment 'cuts off all gifts of money and all loaning of the credit of the state to all

other associations, corporations, etc., but they are all subject to the same objection and appropriations to them of the money of the state are liable to the same abuses. They must all stand or fall together.' (Journal, p. 452.) In this form the section now stands in our constitution. (Art. VIII, sec. 9.)

"We find therefore, among others, two limitations imposed on the legislature in addition to the one that was always implied. They both relate to gifts or loans either of the credit or the moneys of the state. 'The credit of the state shall not in any manner be given or loaned to or in aid of any individual.' (Art. VII, sec 1.) 'Neither the credit nor the money of the state shall be given or loaned to or in aid of . . . any private undertaking.' (Art. VIII, sec. 9.) They both also represent the triumph of efforts to prevent improvidence, to make useless any pressure from special interests, to safeguard the credit of the state, and the interests of the people as a whole. They are not to be brushed aside. They are to be fairly construed to obtain the object for which they were intended. . . .

"As we have seen, this act provides that $45,000,000 shall be raised by the state upon its bonds and the proceeds applied as a bonus to those who have been in the military service of the United States. We have seen also that the proceeds can be used only for this one object. Is this a gift or a loan of the credit of the state? Clearly it is not a loan. A loan implies repayment. Here there is no such situation. The bonds are issued for full value. Their proceeds are transferred absolutely with no promise, express or implied, of return.

"If not a loan then does this act contemplate a gift of the state's credit? In answering this question the mere form of the transaction is immaterial. If the gift of the bonds of the state to a railroad corporation would be such a gift—and it undoubtedly would be—then so would be an issue of bonds by the state with the express condition that their proceeds should be given to the same corporation. The evasion of the constitutional prohibition would be palpable and it could not and should not be permitted.

"The important question is, therefore, whether under this act the provisions made for the soldiers and sailors is a gift to them or a gift in their aid. . . .

"Such we believe is the situation here. The state proposes to give its credit to the soldiers and sailors, not to satisfy any obligation that it owes them, but as a gratuity. The act is, therefore, prohibited by section 1 of article VII of the constitution. . . . ''    (Italics ours.)

We are fully in accord with the conclusions expressed by the court of appeals of New York in relation to the distinction between a loan of money and one of credit. As pointed out by that court in the gift of the money of the state, raised by current taxation, we are expressing our own gratitude, by giving our own, but when the gratitude is expressed in the issuance of bonds and the gift of the proceeds of the sale thereof, we are expressing our generosity at the expense of our posterity. When the people have so keen a sense of gratitude, or of public purpose that they are willing to give of their substance to express that conviction, there is little danger that excessive or unreasonable burdens will be thus assumed, but when one generation can be generous at the expense of the next, there is danger that the expression may not be so reasonable or so well considered. Hence it is clear that there is a marked distinction between the loan of money and a loan of credit. This distinction is equally clear, if the loan is for a short time as if for a long time, although the reasons for the distinction are not the same. This question is not new in this state and perhaps it would have been sufficient merely to cite a decision of this court under the constitution of 1849, which also contained a prohibition against giving or loaning the credit of the state (Art. XI, sec. 10, Const. 1849). It is as follows: "Sec. 10. The credit of the state shall not in any manner be given or loaned to or in aid of any individual, association, or corporation; nor shall the state, directly or indirectly, become a stockholder in any association or corporation."

This court held in *People* v. *Pacheco,* 27 Cal. 176, that a bond issue of $1,500,000 in aid of the Central Pacific Railroad was not a violation of the section quoted when the act authorizing the issue levied a tax and appropriated the fund from the successive tax levies to pay the bonds. The argument advanced in support of that conclusion is that the law authorizing an expenditure did not create a debt within the meaning of article VIII of the constitution of

1849 (similar in terms to article XVI of our present constitution) when accompanied by a provision for a tax levy and an appropriation thereof to pay the same (*State* v. *McCauley*, 15 Cal. 429; *Koppikus* v. *State Capitol Com.*, 16 Cal. 249), hence it was held that as there was no debt of the state within the meaning of article VII, constitution of 1849, there was no loan or gift of credit, within the meaning of article XI, section 10, constitution of 1849. In the course of its decision the court made the following observations concerning the matter:

"Besides, as we held in the discussion of the first point, no debt on the part of the state is created, and consequently no credit in any proper sense of the term arises. The act of the state in assuming to make these payments, consists in a single provision made in advance, raising a fund, setting it aside and specifically appropriating it to the payment of the interest semi-annually, from year to year, upon the presentation of the coupons at the state treasury—these coupons serving as warrants upon which the money is to be drawn from the treasury. As no debt or liability in the constitutional sense is created, so no credit in the constitutional sense arises, or is loaned or given. A fund is provided in advance for the purpose, and out of it the services to be rendered by the company to the state are to be paid, but the payments are to be made on behalf of the company, in satisfaction of interest due from it to certain designated creditors. The money being provided in the first instance, and being in contemplation of law always on hand in the treasury before the installments of interest accrue, the transaction on the part of the state upon the principles before stated, is regarded as a cash transaction. From these views it follows that the act in question is not repugnant to section 10 of article XI of the constitution.

"Our conclusion is, that the act in question is constitutional.

"The judgment, so far as it denies the relief asked for in the complaint, must, therefore, be affirmed. . . ."

These cases form a part of the judicial history of the state and an authoritative interpretation of similar provisions in the constitution of 1879 (*Sharon* v. *Sharon*, 67 Cal. 185 [7 Pac. 456, 635, 8 Pac. 709]; *People ex rel. Par-*

*sons* v. *Edwards,* 93 Cal. 153 [28 Pac. 831]; *People* v.
*O'Brien,* 96 Cal. 171 [31 Pac. 45]). This distinction is
pointed out by the supreme court of Wisconsin in *State
ex rel. Atwood* v. *Johnson,* 170 Wis. 251 [176 N. W. 224,
228], *supra,* and it is there held that no gift of credit
is made by the Soldiers' Educational Bonus Act of that
state where the appropriation is accompanied by a tax levy
covering five years.

It follows that there is a clearly recognized distinction
between the loaning of credit and the loaning of money.
Indeed, the distinction is clearly recognized in article IV,
section 31, which prohibits the legislature from giving *or
lending* of the credit of the state and also prohibits ''the
making of any gift, of any public money or thing of value
to any individual, municipal or other corporation whatever''
but does not prohibit the loaning of the money of the state.

We conclude, therefore, that the act known as the Veter-
ans' Welfare Act is not violative of article IV, section 31,
of the constitution so far as it permits the use of money
appropriated by the act from funds not otherwise appropri-
ated, for the purchase and sale of land. The exigencies of
this case require us to go no further, but as we have pointed
out the loaning of money derived from a bond sale is held
by the court of appeals of New York to be a loan of the
credit of the state, inasmuch as the statutes under con-
sideration contemplate a sale of $10,000,000 in state bonds
under the Veterans' Bond Act (Stats. 1921, p. 959), to raise
additional moneys to carry out their purposes (Stats. 1921,
sec. 23, p. 976; Stats. 1921, sec. 8, p. 818). The point is in-
volved in the entire legislative scheme but is not involved in
the case before us, because if the law is constitutional as to
the use of the appropriations already made the writ should
be granted. We therefore do not wish to be understood as
passing upon the validity of the Veterans' Bond Act (Stats.
1921, p. 959, *supra*).

In the Veterans' Farm and Home Purchase Act (Stats.
1921, p. 815), the law does not specifically state that the
board shall make payment to the owner of the land pur-
chased. The statute considered without reference to consti-
tutional limitations would perhaps justify the interpretation
that the board might enter into contracts for the purchase
of homes or land to be paid for in installments and then sell

upon a similar contract payable upon similar terms as to time and interest and thus in effect arrange for the payment by the veteran to the owner of the land through the medium of the veterans' board. If such an arrangement was made it would no doubt be in its purpose and effect a loaning of the credit of the state, for the only thing invested by the state in the land under such circumstances would be its credit or guaranty, otherwise the arrangement might as well been made by the veteran, as vendee, with the land owner for direct payments to him as such vendor. The only purpose of the intervention of the veterans' board would be to assure the vendor that he would be paid. The law, however, provides for the purchase of real estate by the board and its resale and we must assume that in carrying out the law it would be done in the manner which conforms to the constitution and not by an arrangement whereby the credit of the state is pledged for the payment of the debt of the veteran. The question as to the method of purchase is not involved in this proceeding except in so far as is necessary to hold that the law can be carried out in a constitutional manner.

This statute also provides for loans not to exceed $3,000 to each individual for the purchase of stock and farm improvements, the purpose being to permit a veteran who becomes an actual settler not only to acquire the land upon easy terms of payment, but also to acquire the necessary equipment for the profitable operation of the land in order that thereby he may be able to pay the purchase price of the land, improvements, and stock. The law does, however, authorize loans to the extent of $3,000 without security. If the question were directly involved as to whether or not such a loan might be made without security upon the terms which delayed the repayment to the state for five years and which would permit the veteran to sell the property acquired by the money so advanced to him by the state, without restriction, it might well be contended that such a loan to a financially irresponsible person would be in effect a gift and thus violative of the constitution. The question, however, is not directly involved, as no such loan has been made or is contemplated, and here again we must assume that if such an unsecured loan is a gift in violation of the constitution, that the welfare board will not make such an unsecured loan,

but that it will require adequate security so that the transaction may be in fact as well as in name a loan and not a gift. We refer to this matter for the purpose of calling attention to the fact that the validity of this provision of the law is not involved in this proceeding and that we do not pass upon it for that reason. If the proceedings were not avowedly for the purpose of testing the validity of the statute, we would not feel it necessary to note these limitations upon the question which we are authorized to determine, as such limitation is always implied.

What has been said concerning article VI, section 31, of the constitution largely determines the alleged invalidity of the scheme of land purchase under section 32 of the same article. This section prohibits the granting of extra compensation or allowance to a public servant after service rendered. This section repudiates claims based upon moral obligations, growing out of service to the state (*State* v. *Colgan*, 91 Cal. 651 [25 Am. St. Rep. 230, 14 L. R. A. 459, 27 Pac. 1089], *supra; Bourn* v. *Hart*, 93 Cal. 327 [27 Am. St. Rep. 203, 15 L. R. A. 431, 28 Pac. 951], *supra; Conlin* v. *Board of Supervisors*, 99 Cal. 21 [37 Am. St. Rep. 17, 21 L. R. A. 474, 33 Pac. 753], *supra*), and hence decisions in other states holding that payments made where there is a moral obligation are not gifts or loans do not apply in this state. (*People* v. *Westchester County Nat. Bank*, 231 N. Y. 476 [15 A. L. R. 1344, 132 N. E. 241], citing on this point *Munro* v. *State of New York*, 223 N. Y. 208, 215 [119 N. E. 444]; *Cole* v. *State of New York*, 102 N. Y. 48 [6 N. E. 277]; *O'Hara* v. *State of New York*, 112 N. Y. 146 [8 Am. St. Rep. 726, 2 L. R. A. 603, 19 N. E. 659]; *Wheeler* v. *State of New York*, 190 N. Y. 406 [123 Am. St. Rep. 555, 83 N. E. 54]; *Lehigh Valley R. R. Co.* v. *Canal Board*, 204 N. Y. 471 [Ann. Cas. 1913C, 1228, 97 N. E. 964]; *Splittorf* v. *State of New York*, 108 N. Y. 205 [15 N. E. 75].) If, therefore, the statutes in question otherwise provide for gifts or loans in violation of section 31, article IV, they cannot be excepted from such provisions on the ground that such payments are made in discharge of a moral obligation; on the other hand, if they are not grants or allowances, as we hold, then section 32 does not prohibit them.

[4] Respondent contends that the appropriations made in the two laws under consideration, aggregating $3,500,000,

violates section 1 of article XVI. This section prohibits the legislature from creating debts or liabilities aggregating, together with all previous debts and liabilities, the sum of $300,000, except in case of war, to repel invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest of such debts or liability as it falls due, etc. It is sufficient to say that the legislation in question does not create any debt or liability or purport to. The legislation in question appropriates from public funds available for that purpose the amount specified in each law for the purposes therein indicated. It does not authorize the petitioner to contract any indebtedness in excess of the amount appropriated or actually available for the purposes of executing the law. (See *State* v. *McCauley, supra; Koppikus* v. *State Capitol Com., supra,* and *People* v. *Pacheco, supra.*) In so far as the Home Purchasing Act could be construed to authorize the petitioner to purchase farms and homes in excess of the amount appropriated by the legislature to pay for such homes or available from the funds set apart for that purpose, it might well be claimed that the making of contracts by which the state, through the Veterans' Welfare Board, agreed to purchase from the owners homes and farms for resale to the veterans would be violative of this constitutional provision if the board endeavored to execute contracts by which they as officers of the state were obligated to pay for such homes and farms an amount larger than the appropriation available for such purpose, relying upon the veteran to make the payment to the board and for the payment of the land from such funds. In other words, if the total indebtedness assumed by the board exceeded the appropriation, it might be well said that not only was the scheme violative of the provision prohibiting the lending of the credit of the state, but also that by so lending the credit of the state the indebtedness assumed by the state, if it exceeded the amount limited in section 1 of article XVI—namely, $300,000—would be also violative of this section of the constitution. We are not required to anticipate that this will be done; on the contrary, we should assume that the petitioner, in carrying out the laws in question, will construe them in conformity with the constitution

and that their conduct thereunder will be regulated by the constitution and such construction of the statutes. There is, therefore, no violation of section 1 of article XVI in the law if properly construed with relation to its constitutional restriction upon legislative power.

The writ is granted as to all items of expenditure under the Home and Farm Purchasing Act (Stats. 1921, p. 815) and the Veterans' Welfare Act (Stats. 1921, p. 969). That is to say, the writ is granted as to the claims set out in exhibits "A" and "B" to the petition.

Lennon, J., Sloane, J., Waste, J., Shurtleff, J., Shaw, C. J., and Lawlor, J., concurred.