[Civ. No. 13912. First Dist., Div. One. Dec. 24, 1948.]

ROY F. SHEAN, Appellant, v. HENRY W. EDMONDS et al., Respondents.

Crist & Stafford for Appellant.

Gilbert D. Ferrell, District Attorney, A. S. Whitmore, Chief Deputy District Attorney, and Hoffman & Draper for Respondents.

WARD, J.—Plaintiff, on behalf of himself and all other taxpayers of San Mateo County, appeals from a judgment of the superior court in favor of the members of the board of supervisors, the treasurer of the county, San Mateo County Fair Association, and the county of San Mateo.

The action was instituted to recover from the named defendants, other than the county of San Mateo, a judgment in the sum of $48,013.42. In the trial court and on appeal the respective parties present an agreed statement of facts. It appears that disbursements in the amount specified were paid by check by the treasurer of the San Mateo County Fair Association from funds received by San Mateo County from the State of California and deposited in a private bank in pursuance of directions from the State of California, Department of Finance. The action does not involve fraud or failure to secure value in the expenditure of state or county funds. The return of the money to the county treasurer would merely result in the county executive officially approving or disapproving the expenditures in conformity with county charter general power in lieu of or in addition to approval or disapproval by the state Department of Finance.

The question presented is whether the state statutes or the county charter govern the disposition of funds allocated by the state to the county from the State of California Fair and Exposition Fund. In brief, do the charter provisions supersede the statutory provisions providing for the maintenance and conduct of a fair conducted by the San Mateo County Fair Association, a nonprofit corporation? In considering the problem it may be assumed but not decided herein that there is no conflict over the expenditure of state funds between district agricultural associations or counties designated as districts *without* local charter government, and the state Department of Finance.

Appellant's position is that under the provisions of article XI, section 7½ of the state Constitution, a county may frame a charter, subject to constitutional limitation, which shall supersede all inconsistent general laws relative to matters provided in the charter. If the provisions fixed in the charter conflict with general laws, the charter provisions prevail, otherwise the adoption of a charter would be "a mere superfluous or idle act." (*Reuter* v. *Board of Supervisors,* 220 Cal. 314, 321 [30 P.2d 407]; *Estate of Miller,* 5 Cal.2d 588 [55 P.2d 491].)

The charter provisions may be set forth prior to mention of the pertinent Agricultural Code provisions. The charter of the county of San Mateo, in article IV, section 1, creates the position of county executive. (Stats. 1933, pp. 2953, 2959.) Whatever power or authority is conferred upon the executive must emanate from the charter or by county legislative action. The county executive power, authority or control over the board of supervisors is so limited by article V of the charter. ''The board of supervisors shall have and exercise all the powers, and shall perform all the duties, vested in and delegated to them by the Constitution and general laws, of the State of California, and by this charter.'' (Stats. 1933, ch. 35, art. III, § 1, p. 2957.) The appellant states that the board of supervisors is the legislative and policy fixing branch of the county government and that the county executive carries out the policies under the direction of the board. In addition to other power and duties, the county executive shall have the power under article V (j), page 2963 ''To examine all claims against the county, and to endorse his approval or disapproval thereon, with his recommendation for the allowance or disallowance thereof, prior to action thereon by the board of supervisors.'' There is another provision that no claim against the county shall be allowed unless first presented to the county executive for approval or rejection. (Art. X, § 4.) Article V, section 3, page 2963 provides that ''The county executive shall have plenary power, subject to the provisions of general laws, with respect to advertising or exploiting the resources of the county. . . . He shall consult with the board of supervisors with respect to any appropriations made by the board of supervisors for advertising or exploiting such resources. Any appropriation made by said board of supervisors shall be upon the recommendation of the county executive.'' However, the power of the county executive is limited. ''The county executive, among other limitations not herein expressly enumerated, shall not be vested with power under this charter: (a) To exercise any legislative function. (b) To expend any sums of money, except in pursuance of appropriations or authorizations so to do made by the board of supervisors, or by this charter.'' (Art. V, § 4, subds. (a) and (b), pp. 2963-2964.) The county executive may make recommendations, but his approval or disapproval of a claim is not binding on the board of supervisors. He has power, ''subject to the provisions of general laws'' with respect to advertising and exploiting the resources

of the county, but the charter is silent on the executive's power to supervise the conduct of a fair, which generally includes educational and amusement features, together with the exhibition of livestock as well as a display of mechanical contrivances. If the framers of the charter had anything more in mind than advertising and exploiting the natural "resources of the county" as a "power" of the county executive, there is a failure to state such additional power in the charter.

The authority upon which the respondents acted emanated from the Constitution of California (art. IV, § 25a) and the Business and Professions Code (div. 8, ch. 4, art. 4 and art. 8), which legalize horse racing and wagering thereon. Section 19485 specifically sets forth the amount and the manner of payment of license fees required to conduct horse racing. Article 9 provides for contributions to fairs, with the approval of the state Department of Finance. Section 19620 of such article specifically provides: "All fees, commissions, and other moneys received by the board, except that part of the license fee required by Section 19485 in excess of 4 per cent of the gross amount of money handled in the pari-mutual pool shall be paid into the treasury and credited to a special fund hereby continued in existence, known as the 'Fair and Exposition Fund.' " Section 19621 confers upon the state Department of Finance the right to audit and supervise the expenditure of state funds appropriated to all fairs, county citrus fruit fairs and agricultural associations. Section 19624 of the Business and Professions Code specifies certain percentages of the fund to be annually appropriated and subdivision (b) thereof provides: "Forty per cent for the encouragement of county, district, or combined county and district agricultural fairs . . . to be apportioned by and expended under the supervision of the Department of Finance in the manner and for the purpose prescribed by Section 92 of the Agricultural Code and other applicable provisions of law."

Section 92 of the Agricultural Code relating to agricultural districts and particularly to county or district agricultural fairs was amended in 1947. "The Department of Finance shall apportion any money appropriated by the State for the encouragement of county, district or combined county and district fairs to the various agricultural fairs on the basis of the amount which each fair actually paid in premiums for agricultural, horticultural, mineral and live stock exhibits, and exhibits of domestic arts and agricultural mechanics made or manufactured for other than commercial purposes in each

year. The money so apportioned shall be paid to the several counties and district agricultural associations as soon as such apportionment is determined.

"The Department of Finance, out of any money on hand to be apportioned, may advance to any county or district agricultural association, for the purpose of paying premiums, at any time during the year, any portion of the money to which, in the opinion of the Director of Finance, the county or district agricultural association will become entitled for that year. The county or district agricultural association shall deposit such money in a separate bank account approved by the Director of Finance in accordance with the provisions of Section 10 of an act entitled 'An act to authorize and control the deposit in banks of money belonging to or in the custody of the State and to repeal all acts or parts of acts in conflict with this act,' approved April 12, 1923, as amended. Such money may be expended for premiums, capital outlay, including purchase of land, construction, improvements, equipment, for the acquisition, installation, maintenance, and operation of recreational facilities at fairgrounds of the county or district agricultural associations or other purposes for the encouragement of county or district agricultural association fairs pursuant to a budget submitted to, and approved by, the Department of Finance subject to the provisions of Section 677.5 of the Political Code." (Stats. 1947, ch. 643, § 92, p. 1662.) Political Code section 677.5 has been replaced by Government Code, section 13320. The last section provides for the submission of a budget by an agency or court to the state Department of Finance for which an appropriation may be made. The third paragraph of Agricultural Code, section 92 provides: "All sums expended from such moneys for construction and improvements by counties shall be subject to the provisions of Section 4041.18 of the Political Code. The county auditor or secretary of any such fair desiring to share in any such appropriation shall file with the Department of Finance on or before December 31st, of each year, a sworn statement setting forth the actual amount paid for premiums by such fair held in that year." Political Code, section 4041.18 (see Gov. Code, § 25351) relates to the general powers of a board of supervisors and specifically to the right to construct, lease and maintain buildings and advertise farm and other resources of the county.

The state Department of Finance prescribed the conditions for the reception by the county of the state fair and exposition

fund and the deposit of the money in a bank. The money may be expended for premiums, capital outlay, including purchase of land, construction equipment or other purposes. (§ 92.)

The legislative history of section 92 reveals that it was enacted in 1933, when Political Code, section 694—upon which it is based, was repealed. Political Code, section 694 (added by Stats. 1929, p. 366) provided: "Any money appropriated by the State of California for the encouragement of county and district agricultural fairs shall be expended under the supervision of the state department of finance for premiums for agricultural, horticultural and live stock exhibits only. The state department of finance shall apportion the money appropriated for the various agricultural fairs held in any county or by any group of counties on the basis of the amount which such fairs actually paid in premiums for agricultural, horticultural and live stock exhibits, at the fairs held in the preceding year." Insofar as it provides that "Any money appropriated . . . shall be expended under the supervision of the state department of finance for premiums for agricultural, horticultural and live stock exhibits only," this section supports the construction of section 92 urged by respondents—namely, that any money appropriated is subject to state supervision as provided in the second paragraph of section 92 requiring deposit in a separate bank account approved by the Director of Finance in accordance with section 10 of the act controlling bank deposits of money "belonging to or in the custody of the State." In 1945, Government Code, section 16506 was enacted. This section is based on a similar provision found in the statutes of 1923, chapter 16, section 10, page 25, as amended. Section 16506 provides: "All money belonging to or in the custody of the State under the control of any State officer or employee, other than the Treasurer, except petty cash funds authorized by the Department of Finance, shall be deposited as active deposits in such State or National banks in this State and under such conditions as the Director of Finance prescribes . . ."

Appellant seeks to distinguish between "advanced money" and "apportioned money." According to appellant section 92 refers to "apportioned" money as money paid to the county, but the provision dealing with "advanced" money "could properly be controlled as 'money belonging to or in the custody of the state.'" This is practically an admission that the state may direct the deposit and supervise the expenditure of "advanced" money by placing it in a private

bank. One purpose of "advanced" money is to pay "premiums," but the money deposited in banks under the provision of the statute may be used to purchase land, construct buildings and operate a fair. (Agri. Code, § 92.)

The county executive's right to recommend the approval or disapproval of expenditure of funds is confined to county funds. The facts in this case show that the funds are accepted, not to be expended absolutely for a purpose in the discretion of the board of supervisors or other officer of the county, but conditionally that the fund shall be expended in accordance with statutory direction. The county supervisors may not accept the fund from the state under any other agreement.

Appellant relies upon *Reuter* v. *Board of Supervisors, supra,* which involved the issue of the right of the Board of Supervisors of San Mateo County to perform certain duties in relation to roads and highways as imposed by general laws. The San Mateo charter provided that the duties should be performed by the county engineer which in effect transferred the duties of road commissioner from the board of supervisors to that officer. In the Reuter case the court stated (p. 325) : "While the state may have a general interest in the roads and highways of the counties it is not concerned with the particular individual whose duty it is simply to employ the men and teams and other help necessary to construct and repair such roads and highways." In that case whether the members of the board of supervisors or the county engineer should supervise the construction and care of roads was a matter of only county or local concern. Hence the use of the language previously quoted from the Reuter case to the effect that in that case the charter provisions prevailed.

In the present case the state has more than a general interest in the conduct of a county fair if the fair is maintained from state funds. The present case differs from the Reuter case in that it would have been repugnant to the provisions of the San Mateo charter to hold that the state provision prevailed on the maintenance of roads. Here, under the agreed statement of facts and the state law a plan has been mapped that does not infringe upon the prerogative power of the county executive. The distinction between this case and the Reuter case is that in the latter case the statutory provision was inconsistent with the provisions of the charter. In this case the contention of appellant that as executive officer no

payment of claim presented to the board of supervisors is valid unless the executive approves or disapproves a claim is not based upon any fact that appears in the agreed statement of facts, such as, that any claim connected with this matter was ever presented to the board of supervisors and hence the approval or disapproval by the executive could not in fact or in law be made.

Appellant mentions that some five subventions and grants from the federal government and more than ten subventions and grants covering separate and distinct and specified purposes were received by San Mateo County without segregation as county funds and disbursed on claims submitted to the county executive. Appellant does not give the legislative historical background of any of the subventions mentioned or point out their pertinency to the statutes or charter involved herein, and hence such subventions may be ignored in determining the issues on this appeal. (*People* v. *Hermes,* 73 Cal. App.2d 947 [168 P.2d 44].)

Appellant urges that under article IV, section 22 of the Constitution, the San Mateo County Fair Association could only receive county funds from the county—the latter having received an appropriation from the state fair and exposition fund. The constitutional provision contains the following: ". . . no money shall ever be appropriated or drawn from the State Treasury for the purpose or benefit of any corporation, association . . . or any other institution not under the exclusive management and control of the State as a State institution . . ." This provision is discussed in *People* v. *San Joaquin etc. Assoc.,* 151 Cal. 797 [91 P. 740]. That case holds that a district agricultural association may receive state funds without violation of article IV, section 22, because "The provisions of the act providing for district agricultural associations clearly evince an intention to make them public corporations." (P. 803; see, also, 1 Cal.Jur. 875.) The case does not directly involve the propriety of state aid to a county fair association.

In *County of Alameda* v. *Janssen,* 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141], the court stated: "It is well settled that, in determining whether an appropriation of public funds or property is to be considered a gift, the primary question is whether the funds are to be used for a 'public' or a 'private' purpose. If they are for a 'public purpose,' they are not a gift within the meaning of section 31 of article IV. (*County of San Diego* v. *Hammond,* 6 Cal.2d 709 [59 P.2d

478] ; *City of Oakland* v. *Garrison,* 194 Cal. 298 [228 P. 433] ; *Allied Architects Assn.* v. *Payne,* 192 Cal. 431 [221 P. 209, 30 A.L.R. 1029] ; *Veterans' Welfare Board* v. *Riley,* 188 Cal. 607 [206 P. 631].) The benefit to the state from an expenditure for a 'public purpose' is in the nature of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom. (*Allied Architects Assn.* v. *Payne, supra.*)

"The determination of what constitutes a public purpose is primarily a matter for legislative discretion (*Veterans' Welfare Board* v. *Riley, supra*; *Allied Architects Assn.* v. *Payne, supra*; *Daggett* v. *Colgan,* 92 Cal. 53 [28 P. 51, 27 Am.St.Rep. 95, 14 L.R.A. 474] ), which is not disturbed by the courts so long as it has a reasonable basis."

One of the purposes of the apportionment of money, in accordance with the provisions of the Agricultural Code is to encourage county fairs. Though section 80 of the Agricultural Code purports to designate a county or counties or parts of a county as a district, section 92 specifically provides that the "fund" may be apportioned and appropriated for the encouragement of county, district or combined county and district fairs. The San Mateo County Fair Association is a nonprofit corporation which does not contemplate pecuniary gain or profit to its members. The purposes for which it is formed are to "advance the floral, agricultural, mechanical, and all other interests of every kind and nature of the County of San Mateo, and vicinity, and for the competitive exhibition of farm products, floral products, live stock and trials of speed, mechanical products, and all other products of every kind and nature and to promote the general interests of the community, and for all other purposes for which such organizations are intended."

The holding of the fair is related to article 9, division 8, chapter 4 of the Business and Professions Code covering in part the disposition of funds from horse racing and the procedure outlined in the Agricultural Code. The reasonable conclusion is that the statutory provisions or procedure adopted do not violate article IV, section 31 of the state Constitution. "If the declared legislative purpose has a reasonable relation to the provisions of the enactment, judicial inquiry into that question is at an end. (*County of Los Angeles* v. *La Fuente,* 20 Cal.2d 870, 877 [129 P.2d 378] ; *County of Alameda* v. *Janssen,* 16 Cal.2d 276, 281 [106 P.2d 11, 130

A.L.R. 1141]; *Housing Authority* v. *Dockweiler,* 14 Cal.2d 437, 450 [94 P.2d 794].)" (*City of Los Angeles* v. *Post War etc. Bd.,* 26 Cal.2d 101, 109 [156 P.2d 746].)

The general rule is that where a conflict appears in a state law and a county charter provision, the local law prevails, but this rule is not applicable if the intent of the general law is to establish a state policy. In *Slavich* v. *Walsh,* 82 Cal.App.2d 228 [186 P.2d 35], relative to the fixing of salaries by statute or ordinance of municipal court employees, the interpretation of the home rule provisions of the charter was not directly involved, but it was held that the complete control over municipal court, in a county governed by a freeholders' charter, is placed in the Legislature and not in the municipal government. (See *Cunningham* v. *Hart,* 80 Cal. App.2d 902, 906-907 [183 P.2d 75] for other authorities in which general laws have prevailed over conflicting "home rule" laws wherein the question involved was of statewide concern.) "The term 'municipal affairs,' it has been stated, is not a fixed quantity, but fluctuates with every change in the conditions upon which it is to operate." (37 Am.Jur. § 106, p. 717; see, also, 105 A.L.R. 259.)

"Under the constitution the charter of the city is not only the organic law of the city but it is also a law of the state within the constitutional limitations . . . Being an enactment in the exercise of the law-making power of the state it is subject to the recognized rules of statutory construction. In the interpretation of a legislative enactment it is the general rule that the state and its agencies are not bound by general words limiting the rights and interests of its citizens unless such public authorities be included within the limitation expressly or by necessary implication." (*C. J. Kubach Co.* v. *McGuire,* 199 Cal. 215, 217 [248 P. 676].) In *Platt* v. *City and County of S. F.,* 158 Cal. 74, 83 [110 P. 304], it was stated: "Section 8 of article XI of the constitution, provides that any city of the requisite population named therein, through a board of freeholders elected by the electors 'may frame a charter for its own government, consistent with and subject to the constitution.'" From the above it may be concluded that the charter is the fundamental law of the governmental section or area for which it was adopted and ratified, subject to its inhibitions, but limited by the provisions of the "Constitution which is the authority for its creation." (*City of Pasadena* v. *Charleville,* 215 Cal. 384, 392 [10 P.2d 745]; *Southern California Roads Co.* v. *McGuire,* 2 Cal.2d 115 [39 P.2d 412].)

Horse racing was recognized in this state in 1933 (Stats. 1933, p. 2046.) Section 25a of article IV of the Constitution gave certain powers regulating horse racing to the Legislature. "The continuance of the grant of power" as expressed in certain sections of the Business and Professions Code "did not affect its status as previously ratified and confirmed." (*Sandstrom* v. *California Horse Racing Board,* 31 Cal.2d 401, 413 [189 P.2d 17].)

The Legislature through the Business and Professions Code authorized the expenditure, under the supervision of the state Department of Finance, in accordance with the policy outlined in the Agricultural Code that certain state money might be used for the maintenance of county fairs. The money is state and not county money and its use is in accordance with a general state and not a particular county or district policy.

It may be claimed that the approval of the county executive would be merely an additional approval of the expenditure of the "fair funds," but such additional approval would be a dual approval which was not contemplated by the Legislature.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 17, 1949.