Filed 12/15/21  Pacific Gas and Electric Co. v. San Joaquin Local Agency Formation Com. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| PACIFIC GAS AND ELECTRIC COMPANY, | C086008 |
| Plaintiff and Appellant, | (Super. Ct. No. STK-CV-UJR-2015-0001266) |
| v. | |
| SAN JOAQUIN LOCAL AGENCY FORMATION COMMISSION, | |
| Defendant and Appellant; | |
| SOUTH SAN JOAQUIN IRRIGATION DISTRICT, | |
| Real party in Interest and Appellant. | |
| SOUTH SAN JOAQUIN IRRIGATION DISTRICT, | C086319 |
| Plaintiff and Appellant, | (Super. Ct. No. STK-CV-UED-2016-0006638) |
| v. | |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Defendant and Respondent. | |

1

Since 1988, the South San Joaquin Irrigation District (Irrigation) has sought to expand its services to provide retail electric service to more than 38,000 customers within its service area. (See *San Joaquin County Local Agency Formation Commission v. Superior Court* (2008) 162 Cal.App.4th 159, 163 (*Formation*).) For this expansion into retail electric service, Irrigation proposed to purchase or use eminent domain to acquire the existing electrical system located in an area of more than 100 square miles in San Joaquin County from the current retail electric service provider, Pacific Gas and Electric Company (PG&E). In 2005, Irrigation sought approval for the plan from the San Joaquin Local Agency Formation Commission (Formation). Formation denied the application on grounds that Irrigation had not provided sufficient information regarding the expansion plan.

After being rebuffed by Formation, Irrigation attempted to proceed without approval of Formation. Formation sought a writ of mandate in this court to stop Irrigation's planned expansion without Formation's prior approval. In *South San Joaquin Irrigation Dist. v. Superior Court* (2008) 162 Cal.App.4th 146 (*Irrigation*), this court held that Formation's approval was a prerequisite for any expansion by Irrigation into retail electric service. (*Id.* at pp. 156-157.) Shortly thereafter, Irrigation sought to "take the depositions of the commissioners to learn what extra-record information the commissioners had when they denied the application." (*Formation, supra,* 162 Cal.App.4th at p. 163.) This court held that such depositions could not be taken. (*Ibid.*)

In September 2009, Irrigation filed a new application with Formation that detailed its plan to expand into retail electric service. In December 2014, Formation approved Irrigation's application subject to several conditions. Condition Nos. 2 (Condition No. 2) and 4 (Condition No. 4) are pertinent to these consolidated appeals. With Condition No. 2, Formation sought to replace lost tax revenues currently paid by PG&E by requiring Irrigation to pay 2.5 percent of its gross revenues from retail electric service as a payment in lieu of taxes (PILOT) that would fund approximately 160 public agencies in

2

San Joaquin County. Condition No. 4 barred Irrigation from taking final action to acquire PG&E's electrical infrastructure until Formation approved an analysis to be provided by Irrigation that would show it could provide retail electric service at a 15 percent discount from PG&E's forecasted rates for the next decade.

In February 2015, PG&E filed a reverse validation action to challenge Formation's conditional approval of Irrigation's retail electric expansion plan. (Code Civ. Proc., § 860 et seq.; Gov. Code, § 56000 et seq.)[1] The trial court entered judgment in favor of PG&E on grounds that the conditions of approval imposed by Formation violated the California Constitution. Irrigation and Formation appeal from this judgment for which this court assigned case No. C086008. PG&E cross-appeals.

In case No. C086008, Irrigation and Formation have advanced the same arguments: (1) PG&E lacks standing to challenge the PILOT, (2) the PILOT imposed in Condition No. 2 does not violate the California Constitution as an unlawful property tax, and (3) the PILOT does not a constitute an unlawful gift of public funds. In its cross-appeal, PG&E argues that (4) Formation unlawfully delegated to Irrigation the duty to determine whether Irrigation had demonstrated sufficient revenues to support its expansion into retail electric service, and (5) the PILOT imposes taxes that are unconstitutional because they were not approved by the voters.

Even though the trial court entered a judgment in favor of PG&E on grounds that Formation imposed unconstitutional conditions on its approval of Irrigation's expansion into retail electric services, Irrigation proceeded on its plan by negotiating to buy PG&E's electrical infrastructure. After PG&E refused to sell to Irrigation, Irrigation filed an eminent domain action to take PG&E's electrical infrastructure located in Irrigation's district. Rather than relitigate the constitutionality of Condition No. 2 in the new action,

---

[1] Undesignated statutory references are to the Government Code.

3

the parties stipulated to be bound by the outcome in PG&E's reverse validation action. After the trial court entered judgment in the reverse validation action, PG&E moved to dismiss the eminent domain action on grounds that the trial court had ruled that the conditional approval granted by Formation to Irrigation violated the California Constitution. In January 2018, the trial court entered a judgment of dismissal in the eminent domain action. Irrigation appeals. This court assigned case No. C086319 to the appeal from the eminent domain action.

In case No. C086319, Irrigation argues that (6) the trial court erroneously dismissed its eminent domain action because Irrigation had the prerogative to take PG&E's electrical infrastructure even before securing all necessary regulatory approvals, and (7) we should advise the parties on the proper scope of review and standard of proof to be employed by the trial court on remand in the eminent domain action.

In case No. C086008, we accept Irrigation and Formation's abandonment of their argument that PG&E lacks standing. As to the remaining issues, we conclude that Condition No. 2 does not violate the California Constitution as an unlawful property tax, gift of public funds, or tax that requires prior approval of voters. We further conclude that Formation did not unlawfully delegate to Irrigation the duty to determine whether Irrigation had sufficient revenues to support retail electric service. The record shows that Formation commissioners gave conditional approval based on substantial evidence showing Irrigation's financial ability to provide the new electric service. Formation's inclusion of Condition No. 4 to ensure the viability of a 15 percent discount for retail electric service does not undermine Formation's finding that Irrigation had the financial ability to provide retail electric service.

In case No. C086319, we conclude that the trial court did not err in holding Irrigation to its stipulation that it would be bound by the determination of the lawfulness of Formation's approval in the reverse validation action. However, our reversal of the trial court's determination in the reverse validation action also compels reversal of the

4

judgment in the eminent domain action. We decline to provide an advisory opinion on standards of review and proof that might arise as issues in the eminent domain action. Accordingly, we reverse the judgments in cases Nos. C086008 and C086319, and remand for further proceedings consistent with this opinion.

## APPEAL BY IRRIGATION AND FORMATION IN CASE NO. C086008

## BACKGROUND

### *Irrigation's 2005 Application to Formation*

Irrigation is a California special district formed in 1909, and is governed by the Irrigation District Law. (Wat. Code, § 20500 et seq.; see generally *Formation*, *supra*, 162 Cal.App.4th at p. 163.) Irrigation's service territory encompasses approximately 112 square miles that includes the incorporated cities of Escalon, Manteca, and Ripon as well as unincorporated portions of San Joaquin County. Among its services, Irrigation provides drinking water to Manteca, Lathrop, and Tracy, and also provides raw water to the City of Stockton. Irrigation holds rights to 72.5 megawatts of electric generation capacity through construction of the Tri-Dam Project. The Tri-Dam Project is comprised of the Donnells, Beardsley, and Tulloch dams. Irrigation also holds a 50 percent interest in the Tri-Dam Power Authority, a joint powers authority that has rights to 19 megawatts of generating capacity at the Sands Bar Project. In addition, Irrigation owns two hydroelectric generation plants and a renewable energy portfolio. As a wholesale electricity provider, Irrigation has extensive experience in scheduling, purchasing, and marketing electricity.

As this court has previously detailed, Irrigation filed a plan in 2005 with Formation to expand the scope of its services to provide retail electric service within its existing service territory. (*Formation*, *supra*, 162 Cal.App.4th at p. 164.) The plan was premised on acquisition of PG&E's existing distribution facilities either through purchase or eminent domain. PG&E opposed Irrigation's plan. (*Ibid.*) Formation's staff recommended approval of the plan. However, several Formation commissioners

5

expressed concern about the possible need to use eminent domain to acquire PG&E's facilities. (*Ibid.*)

In June 2006, Formation held a formal hearing on Irrigation's application. (*Formation*, *supra*, 162 Cal.App.4th at p. 164.) Formation's commissioners voted to deny the application. One commissioner had reservations about staff relying solely on information provided by Irrigation. Other commissioners believed "there was a lack of sufficient information to prove the case as required by Government Code section 56824.12," which enumerates information required in a plan for new or different services by a special district. (*Id.* at pp. 164-165 & fn. 2.) Thus, "[a]bout three months after the hearing, [Formation] adopted a resolution stating the [a]pplication 'is denied on the basis that [Irrigation] did not demonstrate its administrative, technical, and financial capabilities to provide retail electrical service to the satisfaction of [Formation] pursuant to the requirements of Government Code section 56824.12.' " (*Id.* at p. 165.)

Before Formation filed its resolution denying the application, Irrigation filed an action against Formation for declaratory relief and inverse condemnation. (*Formation*, *supra*, 162 Cal.App.4th at p. 165.) Irrigation also sought a writ of administrative mandamus against Formation for prejudicial abuse of discretion and a writ of mandate on grounds that Formation had improperly considered issues related to eminent domain. (*Ibid.*) PG&E moved to intervene. (*Id.* at p. 166.) Irrigation noticed the taking of depositions of several Formation commissioners, and Formation responded by seeking a protective order. (*Id.* at p. 163.) After the trial court partially granted the protective order, Formation sought a writ of mandate directing the trial court to grant the protective order in its entirety. (*Ibid.*) This court granted writ relief and held that Irrigation was not entitled to engage in the proposed discovery of information regarding extra-record evidence. (*Id.* at pp. 168-169.) In *Irrigation Dist., supra,* 162 Cal.App.4th 146, this Court held that Irrigation could not circumvent the requirement to obtain approval from

6

Formation before expanding its service to provide retail electric service.  (*Id.* at pp. 148-149.)

### *Irrigation's 2009 Application to Formation*

In September 2009, Irrigation filed a second application with Formation to provide retail electric service within Irrigation's service area.  Irrigation's plan promised that retail electric customers would benefit from electric rates that would be 15 percent lower than those charged by PG&E.  In support of the financial feasibility of the proposed plan, Irrigation emphasized its "ownership interest in Tri-Dam and other generation; the recent growth in and substantial cash reserves held by [Irrigation]; and revenues [Irrigation] will continue to receive in the future in excess of the amount necessary for [Irrigation] to provide the existing services it currently provides."  Irrigation indicated its preference to purchase PG&E's existing electrical system but stated that it would likely be required to proceed by eminent domain in light of PG&E's stated refusal to sell its infrastructure.

Irrigation's application pledged to backfill lost revenues to local government that would result from taking over retail electric sales from PG&E.  Irrigation stated that "the benefit of reduced rates to retail customers will not come at the expense of local governments.  [Irrigation's] Board of Directors has pledged to provide the cities within its boundaries and the County with the same revenue as they currently receive from PG&E's electric revenues when [Irrigation] assumes the obligation to provide retail electrical service.  [Irrigation's] economic model allocates 2.5 percent of gross revenues to local governments.  PG&E's existing franchise agreements provide 2 percent."

On December 10, 2014, Formation's executive officer, James Glaser, issued a report recommending that Formation commissioners reject the application on grounds that Irrigation "failed to demonstrate its financial capability to feasibly provide retail electrical service at a 15% discount from PG&E rates."  Even so, Glaser's report "further recommended that [Formation] find that [Irrigation] has the financial capability and can

7

feasibly provide retail electrical service at a 2.5% discount from PG&E rates," but that this minor reduction in rates did not warrant granting the application.

Glaser's report noted that Irrigation – as a publicly owned utility – would not be required to pay taxes as does a private company such as PG&E. The report pointed out that some of the taxing entities that would lose revenues as a result of Irrigation's plan for retail electrical service are within the County of San Joaquin but outside Irrigation's service area. As the report explains, "Each local taxing agency gets a share of the countywide pool [of the unitary tax imposed on private utilities], regardless of whether any state-assessed property is within that agency's boundaries." (Italics omitted.) The report further noted that the proposed PILOT that Irrigation would pay in lieu of PG&E's unitary tax lacked the benefit of voter approval: "Without an election [by voters] there remains a risk that reimbursement of these in lieu fees/and or in lieu property taxes could be challenged and there remains a risk that an estimated $962,276 in property taxes and $766,400 in franchise fees could be in jeopardy under the proposed electric plan."

In December 2014, Formation commissioners approved Irrigation's retail electrical service expansion plan. The approval, however, was subject to several conditions. As pertinent here, Condition No. 2 of Formation's approval provided: "2. Payments in lieu of taxes and franchise fees [¶] [Irrigation] shall allocate two and one-half percent of gross retail revenues to payments in lieu of franchise fees and property taxes as a cost of providing retail electric service, subject to the terms of agreements to be executed with the County of San Joaquin and the cities of Manteca, Escalon and Ripon, to pay franchise fees to the three cities and county and property tax (unitary tax) to the county on behalf of itself and all of the districts in the county."

Condition No. 4 required Irrigation to report back to Formation about the practicability of the 15 percent retail electric discount rate once Irrigation had more information about the costs of acquiring PG&E's electric infrastructure. To this end, Condition No. 4 provided: "4. Feasibility/Rate Discount [¶] a) After acquisition costs

and exit fees have been determined and the terms and conditions of financing have been approved [Irrigation] shall prepare a comprehensive economic report analyzing [Irrigation's] proposed retail rates and the calculation of the percentage rate savings from PG&E's retail rates.  It shall make the report available for written public comment for at least 30 days before the hearing and include in the notice of the meeting that the report is available on [Irrigation's] website.  [¶]  b) [Irrigation] shall not take final action to acquire the PG&E system and implement retail electric service until it has held a public meeting advertised in the same newspapers as those utilized by [Formation] in this proceeding.  The notice shall state the action to be taken and shall specifically indicate the proposed level of discount for the first 10 and 30 years of operation based upon an updated financial analysis demonstrating and supporting the financial ability of [Irrigation] to support such a discount.  [Irrigation] shall not commence providing retail electric service unless the District's Board adopts a finding at the hearing based on substantial evidence that it can provide retail electric service at a 15% discount from PG&E's forecasted rates then filed with CEC for the first 10 years.  [¶]  c) In addition, before [Irrigation] begins providing retail electric service, [Irrigation's] Board shall adopt a finding based on substantial evidence that the implementation of retail electric service shall not impact the irrigation subsidies or rates."

### *The Validation Action:  PG&E's Challenged the Constitutionality of Formation's Conditional Approval*

In February 2015, PG&E filed a reverse validation action under the validation statutes (Code Civ. Proc., § 860 et seq.) and Cortese-Knox-Hertzberg Local Government Reorganization Act of 2000 (§ 56000 et seq.).  PG&E argued inter alia that Condition No. 2 violated the California Constitution because it required a public entity to pay property taxes and also that the PILOT constituted an unlawful gift of public funds.  The trial court determined that PG&E had standing under the validation statutes to challenge Condition No. 2 of Formation's approval of Irrigation's application.

9

As to Condition No. 2, the trial court reasoned that this condition was invalid because it requires Irrigation to replace lost property taxes currently paid by PG&E even though Irrigation is exempt from payment of property taxes. The trial court further reasoned that Condition No. 2 requires Irrigation to make an unconstitutional gift of public funds. On these grounds, the trial court entered judgment in favor of PG&E. Irrigation and Formation appeal. PG&E cross-appeals the trial court's failure to address its argument that voter approval was necessary because the PILOT constitutes a tax.

# I

## *Whether Condition No. 2 Imposes an Unconstitutional Property Tax*

Irrigation and Formation argue that the PILOT imposed in Condition No. 2 does not violate the California Constitution as an unlawful property tax. Closely related to Irrigation and Formation's argument is PG&E's contention on cross-appeal that the PILOT constitutes a property tax that requires prior voter approval. We conclude that the record establishes that Irrigation had revenue available from the Tri-Dam Project and other sources to cover the PILOT. As a consequence, the PILOT is not a property tax or a charge that would increase the electricity charge to consumers. Because the PILOT is not a tax, it does not require voter approval.

## A.

## *Irrigation's Revenue from Other Sources*

PG&E's action alleged causes of action asserting the invalidity of Formation's approval of Irrigation's plan for violating article XIII C, section 1, of the California Constitution. PG&E subsequently moved for summary adjudication of this constitutional claim based on the argument that "[t]he PILOT condition is an unconstitutional tax on tax-exempt government property and cannot be cured even through voter approval."

On March 7, 2016, the trial court denied summary adjudication. In denying summary adjudication, the trial court summarized its reasoning as follows: "PG&E's facial challenge to Condition No. 2 is ripe, but the challenge fails because Condition

No. 2, on its face, does not pose a present, total and fatal conflict with applicable constitutional prohibitions. *Tobe v. City of Santa Ana* (1995) 9 C[al].4th 1069, 1084. Instead, Condition No. 2 allows for multiple scenarios and options in terms of funding and/or structuring payments which will, in turn, affect the characterization of the payments as a 'tax' or a 'gift.' Thus, PG&E has not established that Condition No. 2 is unconstitutional on its face. [¶] With regard to PG&E's as-applied challenges to Condition No. 2, the Court notes that [Irrigation] has not decided, committed to, or otherwise implemented any of the several options available to it, and other aspects of the payments require negotiations which have not yet occurred. Therefore, it [is] impossible for the Court to determine whether the Condition No. 2 payments are a 'tax' or a 'gift.' Thus, the as-applied challenges are not ripe; they are premature." The trial court set the matter for trial.

Trial was limited to the question of the legality of Condition No. 2 and was presented solely on documents in the administrative record. The trial court determined that PG&E had standing to bring the action under the validation statutes. On the merits of PG&E's constitutional challenge, the trial court ruled that Condition No. 2 unlawfully required Irrigation to pay property taxes (in the form of the PILOT) even though it was a tax exempt local governmental agency. The trial court further ruled that Condition No. 2 required Irrigation to make an unconstitutional gift of public funds. The trial court invalidated Condition No. 2 as violating the California Constitution and entered a judgment in favor of PG&E.

## B.

### *Review*

As this court has previously explained, Formation "is a quasi-legislative administrative agency. [Citations.] Its proceedings are 'quasi-legislative in nature' . . . ." (*Formation*, *supra*, 162 Cal.App.4th at p. 167.) Thus, "[a]n action or proceeding to attack a determination of [Formation] extends 'only to whether there was fraud or a

11

prejudicial abuse of discretion. Prejudicial abuse of discretion is established if the court finds that the determination or decision is not supported by substantial evidence in light of the whole record.' (Gov. Code, § 56107, subd. (c).) This substantial evidence review is purely a question of law and is limited to the administrative record." (*Ibid.*) In other words, " 'the *ultimate question*, whether the agency's action was arbitrary or capricious, *is a question of law*. [Citations.] Trial and appellate courts therefore perform the same function and the trial court's statement of decision has no conclusive effect upon us.' (*Shapell Industries*[*, Inc. v. Governing Board* (1991)] 1 Cal.App.4th [218] 233, italics added; accord, *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387; *Personnel Com. v. Board of Education* (1990) 223 Cal.App.3d 1463, 1466.) 'We are not undertaking a review of the trial court's findings or conclusions. Instead, "we review the matter without reference to the trial court's actions. In mandamus actions, the trial court and appellate court perform the same function . . . ." [Citations.]' " (*Carrancho v. California Air Resources Board* (2003) 111 Cal.App.4th 1255, 1275 (*Carrancho*), quoting in part *Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1393.) However, when we review issues of law such as matters of constitutional or statutory interpretation we apply the independent standard of review. (*Placer County Local Agency Formation Com. v. Nevada County Local Agency Formation Com.* (2006) 135 Cal.App.4th 793, 803.)

The parties differ on whether the trial court's judgment after trial determined Condition No. 2 to be unconstitutional on its face or as applied. The California Supreme Court has set forth the general rule that "[a] facial challenge to the constitutional validity of a statute or ordinance considers only the text of the measure itself, not its application to the particular circumstances of an individual." (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1084.) By contrast, "[a]n as applied challenge may seek . . . relief from a specific application of a facially valid statute or ordinance to an individual or class of individuals who are under allegedly impermissible present restraint or disability as a

12

result of the manner or circumstances in which the statute or ordinance has been applied
. . . ." (*Ibid.*) In the context of restrictions imposed by an administrative agency on
proposed actions, considerations of the restrictions imposed under a specific
circumstance generally presents an as-applied challenge. (See *Hensler v. City of
Glendale* (1994) 8 Cal.4th 1, 14.)

Here, the trial court noted that PG&E argued "Condition No. 2 expressly requires
[Irrigation] to replace the property taxes that will be lost if [Irrigation] displaces PG&E,
the county's largest property tax payer, with an equivalent payment." To resolve
PG&E's argument, the trial court found that Formation "was unwilling to approve
[Irrigation's] application if, due to [Irrigation's] takeover, those taxes [currently paid by
PG&E] would be lost by other government entities in the county and not replaced by
[Irrigation]." Thus, the trial court found that the PILOT was intended "to replace the
taxes and fees historically paid by PG&E." This consideration of the factual context and
Formation's intent for Condition No. 2 signaled that the trial court determined the PILOT
was unconstitutional as applied. That the trial court considered whether Condition
No. 2's constitutional violation was a "curable defect" further shows that the issue was
resolved as an as-applied, rather than a facial, challenge.

### C.

### *Condition No. 2's Imposition of a PILOT*

Condition No. 2 requires Irrigation to make a payment in lieu of taxes – essentially
a substitute for taxes that PG&E would otherwise pay on its retail electric service
business. In considering the PILOT imposed by Condition No. 2, we benefit from the
California Supreme Court's guidance in *Citizens for Fair REU Rates v. City of Redding*
(2018) 6 Cal.5th 1 (*Redding*). The *Redding* court set forth the context within which any
analysis of a PILOT must be made, namely the pertinent provisions in the California
Constitution that address taxes and fees imposed by local government. (*Id.* at p. 5.)
Since November 2010, "[s]ubject to certain exceptions, the term ' "tax" ' is now defined

13

as 'any levy, charge, or exaction of any kind imposed by a local government.' (Art. XIII C, § 1, subd. (e).) The definition excludes a charge imposed for a specific government service or product if: (1) the service or product is provided directly and exclusively to those who pay the charge; and (2) the charge does not exceed the reasonable costs to the local government of providing the service or product. (Art. XIII C, § 1, subd. (e)(2).)" (*Ibid*.)

A PILOT is not a tax but a levy intended to replace lost tax revenues. (*Redding*, *supra*, 6 Cal.5th at p. 4.) The PILOT in *Redding*, for example, involved a "compensatory transfer, called the 'payment in lieu of taxes' . . . . The PILOT is based on the amount [the City of Redding Electric Utility] would pay in property taxes under Proposition 13 if it were a private enterprise, rather than a city department. (See [6 Cal.5th at p. 10] [discussing Proposition 13].) While [the City of Redding Electric Utility]'s property is not subject to taxation (art. XIII, § 3, subd. (b)), the city is entitled to recover the value of its provided services. Rather than calculate the actual cost of those services, the city used the amount a private utility would pay in property taxes as a proxy for the actual cost." (*Id.* at p. 6.)

In *Redding*, the City Council "recognized the PILOT *as a cost of operation*." (*Redding, supra,* 6 Cal.5th at p. 6, italics added.) The PILOT in *Redding* did not constitute a tax because its inclusion in the overall price of electricity to retail consumer did not cause the electricity rate to exceed reasonable costs of the service. (*Id.* at p. 13.) Moreover, the utility in *Redding* had sources of funding for the PILOT that did not come from retail electricity customers. (*Ibid.*) Thus, the salient point in *Redding* and this case is that both PILOT's are components of the total cost of providing electric service to be paid by the retail electric customer.

So long as the retail electric customer does not pay an unreasonable cost for electricity service resulting from the inclusion of a PILOT, the PILOT does not constitute a tax to which article XIII C of the California Constitution applies. This principle is

14

illustrated in *Webb v. City of Riverside* (2018) 23 Cal.App.5th 244. In that case, the City of Riverside operated an electrical utility service. On an annual basis, the City of Riverside transferred funds from the utility to the city's general fund. (*Id*. at p. 248.) Although the City of Riverside increased the transfer amount, electric rates for customers were not increased. Thus, the increase in the transferred amount did not amount to a tax increase on electricity consumers as *their* bills were not affected. (*Id.* at p. 249.) As the California Supreme Court would subsequently note, "*Webb* correctly identifies the electric *rate* charged by the utility as the ' "levy, charge, or exaction" ' subject to article XIII C's restrictions." (*Redding*, *supra*, 6 Cal.5th at pp. 14-15.)

## D.

### *The PILOT is Not a Property Tax*

In this case, the trial court erred in determining that the California Constitution prevents Irrigation from paying the PILOT imposed by Formation. We recognize that the trial court lacked the benefit of the Supreme Court's holding in *Redding* that a PILOT may be lawfully collected from a municipal electric utility when the PILOT does not result in an unreasonable cost of electric service. (*Redding*, *supra*, 6 Cal.5th at p. 6.) Under *Redding* and the undisputed facts of this case, the PILOT imposed in Condition No. 2 passes constitutional muster because it can be funded from income that Irrigation derives from sources other than the rate to be paid by Irrigation retail electric consumers. (*Id.* at pp. 6, 13.)

In presenting its plan for retail electric service, Irrigation emphasized its "ownership interest in Tri-Dam and other [electricity] generation" sources. With these additional sources of electricity and revenue, Irrigation pointed out "the recent growth in and substantial cash reserves held" and that Irrigation "will continue to receive in the future in excess of the amount necessary for [it] to provide the existing services it currently provides." During the years of 2005 to 2009 (the period for which Irrigation reported figures to Formation), Irrigation received an average of $10 million each year

15

from its share of Tri-Dam revenues. During the same period, Irrigation's unrestricted cash reserve increased from approximately $25 million to $51 million. By contrast, the PILOT was projected to amount to only $2,029,987 in the first year of retail electric service and $2,286,095 after several years of operation. The record shows that Irrigation had ample resources with which to cover the PILOT from sources other than charges to retail electric customers.

The record also shows that Irrigation's plan would ensure that the retail electricity cost to ratepayers would be reasonable even with the PILOT imposed by Formation. As the California Supreme Court noted in *Redding*, article XIII C, section 1, subdivision (e)(2) of the California Constitution excludes from taxes any charge for a service directly provided to the ratepayer and the charge does not exceed the reasonable cost of providing the service. (*Redding*, *supra*, 6 Cal.5th at p. 5.) Here, the 15 percent discount that Irrigation would provide for retail electricity customers to be assumed from PG&E would result in a reasonable electricity rate. Notably, none of the parties in this case asserts that PG&E's retail electricity rates are anything other than reasonable.

Although PG&E disputes the ability of Irrigation to save retail customers 15 percent on their electricity rates, substantial evidence supports Irrigation's claim of ratepayer savings. Irrigation submitted a retail electric financial analysis that concluded Irrigation's "retail electric utility will be entirely self-funding and that no equity contributions will be needed." Under adverse conditions, the discount rate might fall to 13.5 percent "to maintain positive net cash flow and meet all financial requirements." Formation's executive officer, however, believed that Irrigation was likely to provide only a 2.5 percent discount on PG&E's rate. Because even this lesser cost saving to retail electricity consumers constitutes a reasonable charge to ratepayers, Formation's imposition of the PILOT in Condition No. 2 does not render the transfer a tax that requires voter approval. (*Redding*, *supra*, 6 Cal.5th at pp. 4-5.)

16

PG&E emphasizes that the PILOT would benefit taxing agencies outside of Irrigation's service area. For example, PG&E asserts that "[m]any of the 160 agencies that will receive the PILOTs are outside [Irrigation's] service area, yet [Irrigation] does not attempt to explain how those agencies (which include local governments and schools) will provide [Irrigation] (a water and electricity provider) with services." We conclude that the PILOT's benefit to taxing agencies outside Irrigation's service area does not cause Condition No. 2 to violate the California Constitution.

In addressing this issue, we draw from this court's prior analysis in *Northern California Water Assn. v. State Water Resources Control Bd.* (2018) 20 Cal.App.5th 1204 (*Northern California Water*). *Northern California Water* involved an annual water fee imposed by the State Water Resources Control Board (Board) on various water right permit and license holders in order to defray costs incurred by the Board's Water Rights Division. (*Id.* at p. 1209.) Plaintiffs in that case argued that the fee "constituted an unlawful tax, as opposed to a valid regulatory fee, under article XIII A, section 3, of the California Constitution (Proposition 13) because it required fee payors to pay more than a de minimis amount for regulatory activities that benefited non-fee-paying right holders." (*Ibid.*, fn. omitted.) Specifically, plaintiffs argued that the permit fee was actually a tax because others who were not subject to the fee also benefitted from the efforts of the program. (*Id.* at p. 1218.) This court rejected the argument that the fee was unconstitutional because some " 'non-fee paying rights holders,' . . . received something for nothing . . . ." (*Id.* at p. 1221.) Instead, this court held the fee passed constitutional muster because the fee *to affected payors* was reasonable and proportionate to the costs related to those payors. (*Id.* at pp. 1221, 1227.)

In deciding the matter in *Redding*, the California Supreme Court examined and approved our approach in *Northern California Water.* As pertinent here, the Supreme Court noted an additional ground for the result in *Northern California Water*, namely that "even though non-payors benefitted from program activities, that fact was 'relevant only

17

if the regulatory costs attributable to [them] necessarily were allocated *to the affected fee payors*. If other sources of funding, such as the state's general fund, were sufficient to cover the regulatory costs attributable to [those who benefitted but did not pay], it does not matter that [they] were not charged a fee.' ([*Northern California Water*, *supra*, 20 Cal.App.5th] at p. 1221, italics added.) The [*Northern California Water*] court then concluded the fee was not a tax because 'general fund support for the Division's regulatory activities . . . was more than enough . . . to cover the costs attributable to [those who benefitted but did not pay].' (*Id*. at p. 1224.) In other words, fee payors were not being forced to cover those costs because there was sufficient general fund support to cover them. [¶] *Northern California Water* demonstrates that the mere existence of an unsupported cost in a government agency's budget does not always mean that a fee or charge imposed by that agency is a tax. . . . If the agency *has sources of revenue other than the rates it imposes, then the total rates charged may actually be lower than the reasonable costs of providing the service*." (*Redding*, *supra*, 6 Cal.5th at pp. 16-17, italics added.)

The record in this case establishes that Irrigation would have income from sources other than retail electricity sales that would be sufficient to cover the PILOT imposed by Condition No. 2. These other revenue sources preclude the PILOT from being an unconstitutional tax even if the PILOT funds taxing agencies that are outside of Irrigation's service area.

PG&E also argues that the PILOT represents an unconstitutional tax based on its reliance on *Howard Jarvis Taxpayers Assn. v. City of Fresno* (2005) 127 Cal.App.4th 914 and *Howard Jarvis Taxpayers Assn. v. City of Roseville* (2002) 97 Cal.App.4th 637. Specifically, PG&E argues that Irrigation "cannot meet its burden of showing that a tax is no more than necessary to cover the reasonable costs of the government activity, as required by article XIII C, section 1, subdivision (e), because Condition No. 2 requires that [Irrigation] make PILOTs in the flat fee amount of 2.5 percent of gross retail

18

revenues. . . . Such a flat fee will rise and fall with [Irrigation]'s revenues. It does not represent, nor does it relate to, [Irrigation's] reasonable costs."

We reject this argument's basic premise, which assumes that the PILOT imposed in Condition No. 2 is a tax. As the *Redding* court held, a PILOT on electric utility income that is funded by sources of revenues other than from ratepayers is not a tax. (*Redding, supra*, 6 Cal.5th at pp. 4-5.) Moreover, the Supreme Court pointed out that under the circumstances presented in *Fresno* and *Roseville* "it was clear the interfund transfers *directly increased* customer rates." (*Redding,* at p. 15.) In *Redding*, however, the PILOT passed constitutional muster because "there [was] no evidence that [the City of Redding Electric Utility] customers paid the PILOT through rate payments. Instead, as described below, [the City of Redding Electric Utility] had more than enough nonrate revenue to cover the PILOT. Unlike the in-lieu fees in *Roseville* and *Fresno*, the PILOT was not necessarily passed through to and imposed on ratepayers." (*Ibid.*) Here, as in *Redding*, the electricity provider has more than enough nonrate revenue to cover the PILOT. In short, the PILOT imposed by Condition No. 2 is not a tax because it will be covered by sources of revenue other than charges paid by Irrigation's retail electric customers.[2] In their briefing, none of the parties assert that the PG&E retail electricity rates are unreasonable. That the rate will be 15 percent less than that paid by ratepayers to PG&E establishes that Irrigation's service will be a reasonable cost for electricity service. Thus, the rate for electricity service does not constitute a tax under article XIII C, section 1, subdivision (e)(2) of the California Constitution. Because the PILOT is not a tax, it does not require voter approval. The trial court erred in determining the PILOT imposed by Condition No. 2 to be a tax.

---

[2]     Because we resolve on the merits the issue of whether the PILOT constitutes a tax, we deny Irrigation's motion to partially dismiss PG&E's cross-appeal in C086008.

19

## II

### *Whether Condition No. 2 Makes a Gift of Public Funds*

Irrigation and Formation next argue that the PILOT does not a constitute an unlawful gift of public funds. The argument is meritorious.

### A.

### *Condition No. 2 Was a Requirement Imposed by Formation*

During the hearing on Irrigation's retail electricity expansion application Formation commissioners discussed the fact that Condition No. 2 was based on "the intent that each city will be made whole as they were during the [period when retail electric service was provided by] PG&E." Formation's chairman noted that commissioners had the prerogative to impose conditions on approval of Irrigation's proposal. Consistent with these statements on the record during Formation's hearing, PG&E would subsequently assert in the trial court that Formation's "[c]ommissioners wanted to be certain that all 160 public entities currently receiving funds from PG&E's tax payments would receive the same funds from [Irrigation]'s PILOT." On appeal, PG&E acknowledges that "Condition No. 2 was necessary for the application's [Formation] approval."

### B.

### *Gifts of Public Funds*

Chief Justice Traynor explored the issue of gifts of public funds in *County of Alameda v. Janssen* (1940) 16 Cal.2d 276 (*Alameda County*). Writing for a unanimous court, Chief Justice Traynor explained:

"Section 31 of article IV of the California Constitution prohibits the legislature from making or authorizing a gift of public money or thing of value to any individual or corporation. . . .

"It is well settled that, in determining whether an appropriation of public funds or property is to be considered a gift, the primary question is whether the funds are to be

used for a 'public' or a 'private' purpose. If they are for a 'public purpose', they are not a gift within the meaning of section 31 of article IV. (*County of San Diego v. Hammond* [(1936)] 6 Cal.2d 709; *City of Oakland v. Garrison* [(1924)] 194 Cal. 298; *Allied Architects' Association v. Payne* [(1923)] 192 Cal. 431; *Veterans' Welfare Board v. Riley* [(1922)] 188 Cal. 607.) The benefit to the state from an expenditure for a 'public purpose' is in the nature of consideration and the funds expended are therefore not a gift even though private persons are benefited therefrom. (*Allied Architects' Association v. Payne, supra*.)

"The determination of what constitutes a public purpose is primarily a matter for legislative discretion (*Veterans' Welfare Board v. Riley, supra*; *Allied Architects' Association v. Payne, supra*; *Daggett v. Colgan* [(1891)] 92 Cal. 53), which is not disturbed by the courts so long as it has a reasonable basis. (*Nebbia v. New York* [(1934)] 291 U.S. 502 [78 L.Ed. 940]; *Powell v. Pennsylvania* [(1888)] 127 U.S. 678 [32 L.Ed. 253].) This court has frequently upheld the expenditure of funds by the state or its subdivisions for the benefit of individuals as for a 'public purpose' and hence not within section 31 of article IV." (*Alameda County, supra*, 16 Cal.2d at pp. 281-282.)

In the matter of approving Irrigation's planned retail electricity expansion, Formation constitutes the legislative body that may consider and impose conditions of approval. (§ 56001.) As this court has recognized, a local agency formation commission makes quasi-legislative determinations when it reviews and approves annexations and conditions of annexation. (*Voices for Rural Living v. El Dorado Irrigation Dist*. (2012) 209 Cal.App.4th 1096, 1116 (*Voices*).) "As such, a public agency charged with enforcing or complying with an annexation's conditions of approval has no discretion to disregard them." (*Ibid.*) The same is true of approvals for expansion of services by a local agency under the jurisdiction of a local agency formation commission. (§ 56001.) Finally, we note that a local agency formation commission "may make its approval conditional on a

virtually limitless array of factors . . . ." (*Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 912.)

## C.

### *The PILOT Is Not a Gift*

In this case, Formation exercised its prerogative to impose Condition No. 2 on Irrigation to require Irrigation to pay a PILOT as a prerequisite to providing retail electric service within San Joaquin County. As a requirement imposed by Formation, Irrigation has no discretion to ignore Condition No. 2. (*Voices, supra,* 209 Cal.App.4th at p. 1116.) Consequently, the PILOT does not represent a payment of funds akin to a gift. Instead, Irrigation must pay the PILOT in order to provide retail electricity. As a required payment, the PILOT is not a gift.

We are also not convinced by PG&E's reliance on *Golden Gate Bridge etc. Dist. v. Luehring* (1970) 4 Cal.App.3d 204. In that case, the revenues collected for tolls across the Golden Gate Bridge "increased spectacularly" to the point that the district operating the bridge developed surplus revenues. (*Id.* at pp. 206-207.) The district's directors proposed to pay out some of the surplus revenues to the county governments of the six counties within the district. (*Ibid.*) The question presented in *Golden Gate Bridge* was whether these proposed payouts to the county governments would be an unconstitutional gift of public funds under article XIII, section 25 (now article XVI, section 6) of the California Constitution. (*Golden Gate Bridge,* at pp. 206-207; *California Redevelopment Assn. v. Matosantos* (2013) 212 Cal.App.4th 1457, 1498.) The *Golden Gate Bridge* court held that the proposed payouts would violate the prohibition on gifts of public funds, reasoning that "a showing is needed that the counties would use the funds for purposes for which the district itself could have used them." (*Golden Gate,* at p. 208.) The California Supreme Court would later survey *Golden Gate Bridge* and summarize that holding that "[s]uch transfer would have taken funds collected from one class of users,

22

bridge patrons, and delivered them to another class, county taxpayers, for a purpose unrelated to the limited special purpose of the bridge district." (*Matosantos*, at p. 1499.)

Here, the PILOT replaces the tax that PG&E pays to fund 160 taxing agencies within San Joaquin County. There is no suggestion by PG&E that its current tax constitutes a gift of public funds. Replacing these tax revenues with a PILOT does not change the character of the transfer from a tax that has a public purpose into a gift of funds.[3] The purpose of the PILOT is that the same public taxing entities will receive the same funding from the same ratepayers through the PILOT. Formation had discretion to impose the PILOT and it does not constitute a gift of public funds.

## III

*Whether Condition No. 4 Improperly Delegates Authority from Formation to Irrigation*

On cross-appeal in case No. C086008, PG&E argues that Condition No. 4 unlawfully delegated to Irrigation the duty to determine whether Irrigation had demonstrated sufficient revenues to support a permanent 15 percent discount from PG&E's retail electricity rates. We reject the argument.

### A.

*Formation's Consideration of Irrigation's Financial Ability*

In 2009, Irrigation submitted its application to become a retail electric service provider. As part of its application, Irrigation submitted a financial analysis demonstrating "that it will be able to provide retail electrical service at rates 15 percent below PG&E's rates under a wide range of potential conditions." After receiving Irrigation's application Formation retained its own independent consulting firm, PA

---

[3]     Our conclusion that the PILOT does not constitute a gift of funds under the holding of *Golden Gate Bridge*, obviates the need to consider whether Irrigation's alternative funding sources available for the PILOT from its profitable holdings in the Tri-Dam Project do not remove it from the purview of article XVI, section 6 of the California Constitution.

23

Consulting, to assess the financial viability of Irrigation's proposal. PA Consulting released a report concluding that Irrigation's rates would be 2.3 percent higher than those charged by PG&E. Irrigation responded with a supplement to its application. In that supplement, Irrigation explained how "important facts [were] not evaluated in the consultant's model." Irrigation asserted that, when the omitted facts are considered, it becomes clear that it can provide electricity at a 15 percent discount. Irrigation detailed how these omitted considerations involved Irrigation's reinvestment of its net operating revenues into retail electric service, investment of additional equity in providing the service, and a prediction that PG&E's rates would rise as well.

PA Consulting analyzed Irrigation's supplement to the application and concluded that to achieve the 15 percent rate reduction, Irrigation would need to invest $39 million up front and invest $15 million per year thereafter. Irrigation's board responded to PA Consulting's supplemental report by adopting a resolution committing to the 15 percent rate reduction by meeting PA Consulting's "investment targets," and "reaffirming that it would '. . . commit the additional equity determined by PA to be necessary to provide retail electric service' " at the promised rate. In 2013 and 2014, further financial analyses by Irrigation and PG&E reached different conclusions about whether Irrigation could durably achieve the promised 15 percent discount electricity rate.

In December 2014, Formation held a two-day hearing on Irrigation's application to provide retail electric service. The hearing culminated with Formation's conditional approval of Irrigation's application to provide retail electric service. Formation expressly found that Irrigation "has the administrative, technical *and financial ability* to operate the system." (Italics added.) As pertinent to this issue, Formation sought to ensure that Irrigation would have the financial ability to offer a permanent retail electric rate at a 15 percent discount to the rate charged by PG&E. Thus, Condition No. 4 required Irrigation to "prepare a comprehensive economic report analyzing [Irrigation's] proposed retail rates and the calculation of the percentage rate savings from PG&E's retail rates"

24

once "acquisition costs and exit fees have been determined and the terms and conditions of financing have been approved." Until Irrigation presented this additional information to Formation and Formation had the opportunity to assess the report in a public meeting, Irrigation was barred from taking "final action to acquire the PG&E system and implement retail electric service . . . ."

After Formation issued its conditional approval, PG&E urged Formation to reconsider the matter. On February 12, 2015, Formation commissioners conducted a hearing on PG&E's request for reconsideration. One of main arguments advanced by PG&E was that Condition No. 4 was unlawful because "[Formation] and not [Irrigation] must be the one to determine whether there is sufficient revenue for a permanent 15 percent discount, not a discount just for 10 years." Thus, PG&E's argument focused on the question of whether Formation commissioners had made the required findings *in support of the 15 percent discount*. PG&E did not dispute that Irrigation had sufficient revenues to fund retail electric service in the absence of a discount. Indeed, PG&E's counsel said of the two-day hearing, "it was a heck of a process and really a lot of effort went into it." Thus, PG&E focused on its assertion that Formation commissioners – in adopting Condition No. 4 – had unlawfully delegated to Irrigation the responsibility to analyze whether the full 15 percent discount could be assured to retail electricity customers.

One commissioner responded to PG&E's argument by noting that Formation made "a decision and the decision is based on numbers . . . ." The commissioner explained that the analysis of the 15 percent discount was difficult because no one knew what the acquisition price of infrastructure would be that Irrigation would have to acquire from PG&E. Another commissioner explained that Formation had done its statutory duty because Irrigation "does not need to achieve a 15 percent retail rate reduction in order to demonstrate that it has sufficient revenue to carry out the proposed new or different functions. The PA [Consulting] report, the [Formation] staff report, the MRW report, in

25

combination or individually, provides substantial evidence in the record proceedings that's credible and reasonable for the Commission to reply to a conclusion that [Irrigation] has sufficient revenue to carry out the proposal."

PG&E's counsel noted the voluminous data and reports regarding Irrigation's financial wherewithal: "There's so much stuff in this record, if the question is, 'Is there any substantial evidence?' you could pull out evidence to prove rates are going to go through the sky or they're going to – everything. Okay? [¶] I'll admit that because you've had all these reports. *Yeah, there's substantial evidence*. But you needed to make the determination. And you didn't." (Italics added.)

The hearing concluded with Formation commissioners denying PG&E's request for reconsideration.

In the reverse validation action subsequently filed by PG&E, the trial court addressed this unlawful delegation argument as follows: "Government Code, [section] 56824.14[, subdivision ](a) requires that [Formation] determine whether [Irrigation] has sufficient revenue to expand its services to include the provision of retail electric services to customers within its territory as authorized by Water Code, [section] 22115. After the December 2014 hearings, [Formation] issued its Findings which specifically stated that [Irrigation] has the financial ability/sufficient revenue 'to carry out the proposed new or different function or service (retail electric).' " The trial court further found that "[t]he record includes substantial evidence that [Irrigation] has the financial capability to feasibly provide retail electrical service. . . . In fact, substantial evidence presented to [Formation's] commission indicates that at a minimum, [Irrigation] can provide retail electrical service at a 2.5% discount from PG&E's rates." The trial court noted, "importantly, nothing in the [local agency formation commission] statutes or its legislative history requires a [l]ocal [a]gency [f]ormation [c]ommission to also find that the proposed/project differs from or *improves* the current function or services." To this, the trial court added, "And if the statutes or legislative history did, it is undisputed

26

that, at a minimum, [Irrigation] could provide the service at a 2.5% discount from PG&E's rates."

**B.**

*Government Code Sections 56824.12 and 56824.14*

As this court has previously explained, "investigation and information gathering in aid of, or as a basis for, prospective legislation is [a] legislative function that may be accomplished through administrative agencies. (See *In re Battelle* (1929) 207 Cal. 227, 241; *Connerly v. State Personnel Bd*. (2001) 92 Cal.App.4th 16, 62-63; see also 2 Cal. Jur.3d (1999) Administrative Law, § 285, p. 308 ['Fact-finding for the purpose of supplying the legislature with information on which to base general legislative action is obviously legislative, the determination of facts and formulation of legislative policy being the very core of the legislative function.'] In authorizing administrative agencies to investigate, hold hearings, and report findings, the Legislature is, in effect, using those agencies as an 'arm' of the Legislature itself, performing functions that are quasi-legislative in nature." (*Carrancho, supra,* 111 Cal.App.4th at p. 1266.)

Sections 56824.12 and 56824.14 represent the Legislature's authorization of local agency formation commissions to make findings and determinations regarding whether a local governmental agency may expand its services. To this end, section 56824.12 provides in pertinent part: "(a) A proposal by a special district to provide a new or different function or class of services or divestiture of the power to provide particular functions or classes of services, within all or part of the jurisdictional boundaries of a special district . . . shall be made by the adoption of a resolution of application by the legislative body of the special district and shall . . . be submitted with a plan for services . . . . The plan for services for purposes of this article shall also include all of the following information: [¶] (1) The total estimated cost to provide the new or different function or class of services within the special district's jurisdictional boundaries. [¶] . . .

[¶] (5) A plan for financing the establishment of the new or different function or class of services within the special district's jurisdictional boundaries."

Section 56824.14, subdivision (a), provides that a local agency formation commission "shall review and approve with or without amendments, wholly, partially, or conditionally, or disapprove proposals for the establishment of new or different functions or class of services, or the divestiture of the power to provide particular functions or class of services, within all or part of the jurisdictional boundaries of a special district, after a public hearing called and held for that purpose. The commission shall not approve a proposal for the establishment of new or different functions or class of services within the jurisdictional boundaries of a special district *unless the commission determines that the special district will have sufficient revenues to carry out the proposed new or different functions or class of services* except as specified in paragraph (1) [by resorting to taxes, assessments, charges, and/or bonds]." (Italics added.)

PG&E emphasizes that the Legislature amended section 56824.14 in 2008 to ensure that local agency formation commissions determine that special districts have sufficient revenues to undertake the proposed new classes of service. (Assem. Bill No. 2484 (2007-2008 Reg. Sess.).) The Legislative Counsel's digest for Assembly Bill No. 2484 stated that it was intended to "require the commission to review and approve or disapprove proposals for the divestiture of the power to provide particular functions or class of services, within all or part of the jurisdictional boundaries of a special district, and would prohibit the approval of proposals where the commission has determined that the special district will not have sufficient revenues to carry out the proposed new or different functions or class of services, except as specified." (Legis. Counsel's Dig., Assem. Bill No. 2484 (2007-2008 Reg. Sess.).) PG&E also points out that the Senate Local Government Committee's report mentioned the matter of *Irrigation, supra,* 162 Cal.App.4th 146, as part of its analysis of Assembly Bill No. 2484. The committee's report stated that "AB 2484 fills the gap between local enthusiasm and fiscal reality. The

bill's key reform requires [local agency formation commissions] to deny a district's request to exercise a latent power if the district can't pay for the new service. When local boosters want their special district to deliver a popular service, AB 2484 requires [a local agency formation commission] to ask the tough question: who's going to pay?" (Sen. Local Gov. Com., Analysis of Assem. Bill No. 2484 (2007-2008 Reg. Sess.) as amended May 21, 2008, p. 2.)

In reviewing PG&E's challenge to Formation's determination that Irrigation had adequate financial resources to provide retail electric service, we apply a deferential – but not perfunctory – review. (*Carrancho*, *supra*, 111 Cal.App.4th at p. 1273.) "[I]t is clear the function of judicial review of discretionary actions of an administrative agency is to 'ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' " (*Id.* at pp. 1273-1274, quoting *California Hotel & Motel Assn. v. Indus. Welfare Com.* (1979) 25 Cal.3d 200, 212.)

## C.

### *Analysis*

PG&E's argument is that Formation did not meet its statutory duties under sections 56824.12 and 56824.14. In particular, PG&E contends that Formation itself was required to make the determination that Irrigation could provide a permanent 15 percent discount on retail electricity rates. Notably, PG&E's attorney acknowledged before the Formation commissioners that there was substantial evidence that Irrigation had the financial ability to provide retail electricity service and that the problem lay with Formation unlawfully delegating a finding regarding *the discount*.

As PG&E's attorney acknowledged before Formation's commissioners, the record in this case was extensive and included detailed studies of Irrigation's financial ability to provide retail electric service. There was essentially no dispute that Irrigation had the financial ability to provide retail electricity without a discount. Even the report by

29

Glaser, which recommended against approval of the application, acknowledged that Irrigation had the financial ability to provide electricity at a greater than 2 percent discount. Instead, the dispute centered on whether Irrigation could permanently provide the 15 percent discount.

The record shows that commissioners grappled with the issue of the permanent discount on retail electric service promised by Irrigation's application. As one commissioner explained, the difficulty in making the appraisal of ability to provide the discount on a permanent basis was that the acquisition cost of the infrastructure was not yet certain. To ensure that the promised discount would be realized, the commissioners decided to condition their approval on a requirement that Irrigation conduct further analysis and report back to Formation. We decline to hold that Formation's commissioners were derelict in their duty to ensure Irrigation's financial ability to provide retail electric service by exercising caution about the viability *of the discount.*

Sections 56824.12 and 56824.14 do not require that Formation find Irrigation had the ability to provide a discount to consumers in providing a new service. Instead, sections 56824.12 and 56824.14 are satisfied by a finding based on substantial evidence that the local agency has the financial ability to provide the new service. Formation declared that it "finds the conclusion of PA, the [Formation] staff and [Irrigation], individually and in combination, to be credible and reliable evidence that the Commission can reasonably rely upon to support a conclusion that [Irrigation] has a sufficient revenue source to carry out the proposed new or different function of service (retail electric)." Section 56824.14, subdivision (a), requires only that Formation "determine[]" that Irrigation "will have sufficient revenues to carry out the proposed new . . . class of services . . . ." Thus, we agree with Formation when it stated that, "[i]n order to approve the Application the Commission does not have to find that the proposal will achieve a fifteen percent retail rate reduction . . . ." Accordingly, we reject the argument that Formation's approval violated its duties under sections 56824.12 and 56824.14.

30

# APPEAL BY IRRIGATION IN CASE NO. C086319

## BACKGROUND

Irrigation's retail electrical service expansion plan was approved by Formation in December 2014, and PG&E filed its reverse validation action in February 2015. In July 2016, Irrigation filed an eminent domain action to take PG&E's electric distribution system within Irrigation's service area even though judgment had been entered against Irrigation in the earlier action brought by PG&E to challenge Formation's conditional approval. Irrigation's eminent domain action was deemed related to PG&E's action to challenge Formation's conditional approval, and both matters were assigned to the same trial judge for all purposes. PG&E opposed the eminent domain action on grounds that Irrigation had not obtained valid approval from Formation for its plan to provide retail electric service.

In the eminent domain action, Irrigation and PG&E stipulated that they would be bound by the determination of the issues relating to the constitutionality of Formation's conditional approval in the validation action. As the trial court recounted, "Pursuant to a November 1, 2016 Stipulation and Order . . . the parties agreed and the Court ordered that because issues raised in Paragraphs 9 and 12[4] in PG&E's Answer were being litigated in

---

**4**      In paragraph 9 of its answer, PG&E "object[ed] to the taking under Code [of] Civ[il]. Proc[edure,] [section] 1250.360[, subdivision ](h) on the ground that there was a failure to comply with [the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)] before [Irrigation] adopted the Resolution of Necessity."

In paragraph 12 of its answer, PG&E "further object[ed] to the taking under Code [of] Civ[il] Proc[edure,] [section] 1250.360[, subdivision ](h) on the ground that . . . [Irrigation] has failed to obtain the valid approval from [Formation] to provide such services pursuant to Gov[ernment] Code[,] [sections] 56375[, subdivision ](p) and 56133. [Irrigation] received conditional approval from [Formation] in December 2014. However, that conditional approval was both procedurally and substantively improper.

the [validation statutes] Action, those issues 'shall not be relitigated or tried . . . nor shall any discovery be taken in' the Eminent Domain Action 'pertaining to such issues.' Instead, the parties agreed and Court ordered that 'the issues pertaining to Paragraphs 9 and 12 in PG&E's Answer have been and continue to be litigated in the [validation statutes] Action, and the determination of those issues in the [validation statutes] Action shall be binding and determinative of the issues pertaining to Paragraphs 9 and 12 of PG&E's Answer in this eminent domain action.' "

PG&E moved to dismiss the eminent domain action on grounds that the trial court ruled in the validation statutes action that the conditional approval granted by Formation to Irrigation violated the California Constitution. In January 2018, the trial court entered a judgment of dismissal in the eminent domain action. Irrigation timely filed a notice of appeal.

# IV

## *Dismissal of Irrigation's Eminent Domain Action*

Irrigation contends the trial court erred in dismissing the eminent domain action because Irrigation had the prerogative to exercise eminent domain over PG&E's electrical infrastructure even before securing all necessary regulatory approvals.

## A.

### *Irrigation's Latent Power*

Water Code section 22115 provides that a special district, such as Irrigation, "may provide for the acquisition, operation, leasing, and control of plants for the generation, transmission, distribution, sale, and lease of electric power, including sale to municipalities, public utility districts, or persons." Thus, retail electricity service is a latent power that Irrigation may exercise. (*Irrigation*, *supra*, 162 Cal.App.4th at pp. 150,

---

PG&E incorporates herein by reference the allegations in its [first amended complaint in the validation action], which set forth in detail the bases supporting the procedural and substantive deficiencies in [Formation's] conditional approval."

32

153.)  However, to exercise that latent power, Irrigation must first secure a valid approval from Formation.  (*Id.* at pp. 156-157.)  As this court has previously held, "[t]his conclusion is consistent with the purpose of [local agency formation commissions] as ' "the 'watchdog' the Legislature established to guard against the wasteful duplication of services . . . ." ' " (*Ibid.*, quoting *Bookout v. Local Agency Formation Com.* (1975) 49 Cal.App.3d 383, 388.)

Here, the trial court determined that Formation did not give valid approval to Irrigation's application because the conditions of approval conflicted with the California Constitution.  Under the trial court's judgment in the reverse validation action, Irrigation lacked the prerogative to exercise its latent power to provide retail electric service.  (*Irrigation*, *supra*, 162 Cal.App.4th at pp. 156-157.)  As this court held in *Irrigation*, "[t]here would be no point in establishing a detailed, timely and costly procedure for [local agency formation commission] approval if a disappointed applicant could simply disregard the decision of [the local agency formation commission] and proceed with its plan to provide a new or different service."  (*Id.* at p. 154.)

Despite the trial court's judgment vitiating Formation's approval, Irrigation proceeded to pursue eminent domain against PG&E as if Irrigation could provide retail electric service.  Under the holding of our prior decision, Irrigation did not have the ability to simply ignore the lack of valid approval for its retail electric service plan and proceed as if it could exercise that latent power.  (*Irrigation*, *supra*, 162 Cal.App.4th at pp. 156-157.)  The trial court's judgment had the effect of cancelling Formation's approval and Irrigation was bound by that judicial determination.

## B.

### *The Parties' Stipulation*

PG&E points that "[i]t is hornbook law that the parties are bound by their stipulation . . . ."  The point is well taken.  Trial courts may enter orders binding parties to their stipulation.  (*Ferraro v. Camarlinghi* (2008) 161 Cal.App.4th 509, 540-541.)  "Such

an order may have preclusive effect as between the parties to the underlying stipulation, but not because it satisfies the criteria for claim preclusion or issue preclusion. Rather it is binding on the parties to the extent they have consented to be bound by it." (*Id.* at p. 540.) As this rule applies to Irrigation, it means that Irrigation's eminent domain action depended on the validity of the conditional approval by Formation at issue in the reverse validation action. In the absence of a reversal of the judgment in the reverse validation action, Irrigation cannot simply ignore the trial court's judgment to proceed on its plan to expand into retail electric service. (*Ibid.*)

As this rule applies to PG&E – the other party to the stipulation – it means that PG&E is also bound by the fate of the judgment in the reverse validation action. Indeed, PG&E recognized this when it argues that "this court should consolidate the two appeals and apply its ruling in the Reverse Validation appeal when deciding this appeal. That is the only result consonant with judicial economy that would give proper effect to the parties' stipulation." We agree. As we explained above, we reverse the judgment in the reverse validation action because Formation issued a valid conditional approval of Irrigation's retail electric service application. As a result, the stipulation in the eminent domain action acts to restore Irrigation's approval by Formation to pursue its expansion into retail electric service.[5]

## V

### *Standards Irrigation Hopes to Be Applied in the Eminent Domain Action*

Anticipating a reversal and remand for further proceedings, Irrigation urges this court "to provide *guidance* that validity of the [Formation's] Resolution [approving the application to provide retain electric service], including the determinations of public necessity and more necessary public use, are reviewed by the trial court under the gross

---

[5] We deny PG&E's request for judicial notice and Irrigation's first amended request for judicial notice as unnecessary to the disposition of this appeal.

34

abuse of discretion standard of review." (Italics added.) Irrigation asks us to opine on issues – from the level of deference to be shown to Formation's quasi-legislative determinations to the burden of proof in a takings action – that Irrigation imagines will arise in the trial court. Irrigation's request for an advisory opinion concerns issues that the trial court has not yet reached in the eminent domain action in which they might arise.

The California Supreme Court has admonished that it is "prudent to follow a 'cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more.' " (*People v. Contreras* (2018) 4 Cal.5th 349, 381, quoting *PDK Laboratories Inc. v. U.S. Drug Enforcement Administration* (D.C. Cir. 2004) 362 F.3d 786, 799 (conc. opn. of Roberts, J.).) We will not issue an advisory opinion on issues that might arise in the trial court.

## DISPOSITION

The judgments in cases Nos. C086008 and C086319 are reversed and the matters are remanded for further proceedings consistent with this opinion. Irrigation and Formation shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2), & (5).)


　　　　　　　　　　　　　　　　　　/s/
　　　　　　　　　　　　　　　　　　HOCH, Acting P. J.

We concur:


/s/
RENNER, J.


/s/
KRAUSE, J.

35